Natalie Lyons, No. 293026
Vess A. Miller, No. 278020
CohenMalad, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
Tel: (317) 636-6481
nlyons@cohenmalad.com
vmiller@cohenmalad.com

*To move for *pro hac vice* admission
[*additional counsel listed on signature pages*]
***Counsel for Plaintiffs and the Proposed Class***

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JANE DOE, JANE ROE, JANET DOE, AND JANET ROE individually and on behalf of all others similarly situated,**<br><br>**Plaintiffs**<br><br>**v.**<br><br>**ALAMEDA HEALTH SYSTEM**<br><br>**Defendant.** | Civil Action No. _____<br><br>**CLASS ACTION COMPLAINT FOR:**<br>1. **Negligence**<br>2. **Negligence Per Se**<br>3. **Violation of Comprehensive Computer Data Access and Fraud Act, Cal. Pen. Code § 502**<br>4. **Violation of Consumer Protection Law, Cal. Bus. & Prof. Code §§ 17200,** *et seq.*<br>5. **Violation of Consumer Privacy Act, Cal. Civ. Code, §§ 1798.100,** *et seq.*<br>6. **Breach of Express and Implied Contract**<br>7. **Unjust Enrichment**<br>8. **Breach of Fiduciary Duty**<br>9. **Declaratory Judgment**<br>10. **Breach of Confidence**<br>11. **Violation of Invasion of Privacy Act, Cal. Pen. Code §§ 631,** *et seq.*<br>12. **Violation of Invasion of Privacy Act, Cal. Pen. Code §§ 632,** *et seq.*<br>13. **Violation of Invasion of Privacy Act, Cal. Pen. Code §§ 638,** *et seq.*<br>14. **Violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2511(1),** *et seq.*<br>15. **Violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2511(3)(a),** *et seq.*<br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiffs, Jane Doe, Jane Roe, Janet Doe, and Janet Roe, individually, and on behalf of all others similarly situated (hereinafter "Plaintiffs") bring this Class Action Complaint against Defendant, Alameda Health System ("AHS" or "Defendant"), and allege, upon personal knowledge as to their own actions, and upon information and belief as to all other matters, as follows.

## INTRODUCTION

1.     This case arises from a fundamental betrayal of trust. Defendant, a major healthcare provider, assured patients and other website visitors that their private information would remain confidential. Through its cookie banner and privacy policies, Defendant represented that patients could opt out of cookies and data tracking. In a conspicuous cookie banner on its website,[1] Defendant stated unequivocally: "[y]ou can give your consent to all or selected purposes, or you can decline them all." These representations were false.

2.     In truth, Defendant embedded on its website tracking tools to share patient information with third parties, including Google, LLC ("Google"), The Trade Desk, Tapad, Adnxs, Media6Degrees, Nielson Online, Neustar Marketing, triplelift, Bombora, Merkle, Epsilon Marketing, GroupM, Semasio, LiveIntent, Rakuten, Narrative, MonsterInsights, and Full Circle Studies (collectively the "Third Parties" and their "Trackers") without patient consent, knowledge, or authorization (in short, the "Disclosure").

3.     The Trackers Defendant embedded allowed those Third Parties to intercept, store, and use detailed information about patients' interactions with the site, allowing Third Parties to

---

[1] The banner appears immediately upon a patient's first visit to Defendant's website. It is displayed prominently and persists until the patient clicks "Accept all" or "Decline all."

harvest information including their browsing activities, the pages they viewed and the buttons they clicked, their status as medical patients, their searches for health conditions or concerns, and identifying information including IP addresses and identifying cookies.

4.     Worse still, the supposed "opt-out" offered via the cookie banner was functionally meaningless. Regardless of the patient's selection, tracking occurred. This was not just a breach of trust. Defendant's actions violated both California and Federal law.

5.     By knowingly deploying these tracking technologies in violation of its own express assurances and without meaningful user consent, Defendant violated the California Invasion of Privacy Act ("CIPA") and fundamental expectations of privacy in healthcare. Plaintiffs bring this action to hold Defendant accountable for its unlawful wiretapping and its deceptive practices that left patients exposed – without warning, without choice, and without recourse.

6.     A tracker (also referred to as "tracking technology") is a snippet of code embedded into a website that tracks information about its visitors and their website interactions.[2] When a person visits a website with a tracker, the tracker logs "events" (i.e., user interactions with the site), such as pages viewed, buttons clicked, and information submitted.[3] Then, the tracker transmits the event information back to the website server and to Third Parties, where it can be combined with other data and used for marketing.[4]

7.     Third Parties like The Trade Desk and Google use the data they collect from the Trackers to build individualized profiles of the patients who browse the AHS website. The trackers from The Trade Desk and Google that Defendant installed on its patient's browsers include

---

[2] *See Meta Pixel*, Meta for Developers, https://developers.facebook.com/docs/meta-pixel/ (last visited Mar. 19, 2023).

[3] *See Conversion Tracking*, Meta for Developers, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited May 22, 2023).

[4] Id.

CLASS ACTION COMPLAINT

identifiers unique to each patient. These unique identifiers are "cookies." On information and belief, the cookies remain installed on the patient's browser even after the patient navigates away from the AHS website. Thus, because of AHS's failure to honor the "Decline all" button in its own cookie banner, The Trade Desk and Google intercept and store information about the websites patients visit and the searches they perform, both on the AHS website and elsewhere on the Internet.

8.    On information and belief, The Trade Desk and Google profit from the information they collect by selling targeted advertising space to advertisers, where "targeted" means that The Trade Desk and Google know specific facts about the patient based on their browsing behavior, including searches they performed on the AHS website. The Trade Desk also shares the patient browsing data it collects with other third-party data brokers, via a process known as "cookie syncing."

9.    AHS harmed patients by sharing sensitive and private healthcare information with undisclosed Third Parties even after AHS explicitly promised *not* to do so. The Third-Party data brokers and advertisers then used each patient's private health information to help build a personalized profile of that individual, for the purpose of selling interest-based targeted advertising. For example, when a patient searches for "breast cancer" or "pregnancy" on AHS's website, AHS shares the content of the search, and an identifier unique to that patient, with Third Parties including The Trade Desk and Google. Via cookie syncing, The Trade Desk in turn shares the same information with more than a dozen additional data brokers and advertising platforms. Thus, because of AHS's unauthorized disclosure, the Third Parties know that the patient suffers from breast cancer or is pregnant. The patient is more likely to see advertisements related to these medical conditions as she browses the Internet.

CLASS ACTION COMPLAINT

10.    AHS sold out its patients' trust for a simple reason: money. Because Defendant conceals this information from its patients and the public, Plaintiffs do not know the precise mechanism by which AHS profits from its sharing of patient's browsing data, searches, IP addresses, unique cookie identifiers, and other information. On information and belief, AHS profits by one or more of the following mechanisms. First, AHS receives payments from The Trade Desk, Google, or other Third Parties in exchange for those Third Parties' placement of trackers and related cookies on the AHS website. Second, AHS receives a service or services from The Trade Desk, Google, or other Third Parties either for free or at a discounted price. The service may be a technological tool embedded in the website, such as tools to improve functionality or to monitor website usage and performance. Third, AHS receives the ability to purchase ad space on other websites at a reduced price or at a greater value for the same price. Plaintiffs anticipate learning the precise mechanism(s) by which AHS profits through discovery.

11.    Healthcare patients do not anticipate that their trusted healthcare provider will send their private health information to a hidden third party, especially when the healthcare provider explicitly promises they would *not* install cookies if the patient clicked "Decline all." Here, the Third Parties with whom AHS shares patient information are especially poor stewards of that data. For example, The Trade Desk tracks patient's identities and browsing data explicitly for the purpose of selling advertising space based on that patient's interests and needs, as expressed through their browsing activity and search history. And Google has a long and well-known history of violating consumer privacy and trust for its own gain.

12.    Defendant owed a variety of duties, including common law, statutory, contractual, and regulatory duties, to keep Plaintiffs' and Class Members' communications safe, secure, and confidential.

13.     Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' communications, Defendant assumed legal and equitable duties to those individuals to protect and safeguard their information from unauthorized disclosure.

14.     Defendant breached its duties under California state law, including, for example, the California Invasion of Privacy Act ("CIPA"). That statue provides California consumers with rights to control their personal information including the right to know what personal information is being collected about them and whether that information is sold or disclosed and to whom, the right to prohibit the sale of their personal information, and the right to request deletion of their personal information. Cal. Civ. Code § 630 *et seq*. Defendant breached its obligations under this statute by, for example, failing to provide patients with appropriate notice that their information was being disclosed to Third Parties for third- and fourth- party use. The notice and consent Defendant purports to provide and obtain, through the policies it provides on its website, is not appropriate, as a reasonable Consumer would not have understood those policies as notifying them of Defendant's disclosure of their communications to Third Parties for third- and fourth- party use.

15.     The Trackers Defendant installs on its website are "pen registers" under § 638.50(b) of CIPA because they record "routing, addressing, or signaling information" transmitted by the devices of Defendant's patients. Cal. Penal Code § 638.50(b). The Trackers are also "trap and trace devices" under CIPA § 638.50(c) because they "capture the incoming electronic or other impulses that identify . . . dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication[.]" Cal. Penal Code § 638.50(c). These devices were activated even *after* patients clicked "Decline all," meaning the disclosures occurred without any valid consent and in direct contradiction of Defendant's public assurances.

16.     Defendant repeatedly violated CIPA § 638.51(a) by installing and using the

Trackers without a court order and without any valid consent from users. In fact, Defendant gave users a cookie banner that explicitly claimed they could "decline all" tracking, then proceeded to track them anyway. This false opt-out not only fails to meet CIPA's requirements but amplifies the harm: it encouraged users to share sensitive data under the false belief that it would remain private.

17.     Defendant failed to provide Plaintiffs and Class Members with a meaningful opportunity to opt out of the use of Trackers prior to disclosing their information. Second, even when users did opt out by clicking "Decline all", Defendant continued to disclose their communications and identifying information to Third Parties. These dual failures underscore that Defendant's banner was a deceptive design element, not a genuine consent mechanism, and they render the disclosures unlawful under CIPA.

18.     Not only did Defendant fail to provide Plaintiffs and Class Members with the opportunity to "opt-out," but it further failed to abide by their opt-out requests. Even after Plaintiffs and Class Members chose the "Decline all" option, Defendant continued to disclose their communications to Third Parties like The Trade Desk and Google.

19.     Defendant's installation and use of the Trackers also violates the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq*, because it constitutes unlawful, unfair, and fraudulent business practices. Defendant not only disclosed patient communications to Third Parties without proper authorization but also presented users with a cookie banner that falsely suggested they could opt out of such disclosures. The banner was designed to give the appearance of compliance while functioning as a façade – patients were tracked regardless of their choice. This bait-and-switch tactic is both unfair and deceptive, and it directly harmed Plaintiffs and Class Members by luring them into using Defendant's website under false pretenses. This fraudulent conduct is especially egregious in context: Defendant is a public

healthcare system, entrusted with some of the most sensitive data a person can share. Patients were led to believe that their visits to Defendant's website – often to explore symptoms, treatment options, or appointments – would remain private. Instead, those visits were monetized. This betrayal of patient trust magnifies both the harm and the unfairness of Defendant's conduct.

20.    Defendant further made express and implied promises to protect Plaintiffs' and Class Members' communications and maintain the privacy and confidentiality of communications that patients exchanged with Defendant. These promises included language in Defendant's Terms of Use and Privacy Policies, as well as the affirmative statements in the cookie banner. The banner's representation – that users could "decline all" tracking – constituted an express promise to honor patient choice. But Defendant broke that promise. Even when Plaintiffs and Class Members opted out, Defendant continued to track and transmit their data to Third Parties. In doing so, Defendant violated its express and implied contracts and deprived Plaintiffs of the privacy protections they were told they could expect.

21.    Moreover, Defendant's cookie banner formed part of the overall agreement between Defendant and its patients and website users. As the first and most visible interaction users had with the website, the banner constituted an explicit representation that users had control over the disclosure of their data. By failing to honor opt-out selections and continuing to track users despite those selections, Defendant breached its contractual duties, violated the implied covenant of good faith and fair dealing, and deprived Plaintiffs of the benefit of their bargain.

22.    Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiffs and Class Members' communications, Defendant assumed legal and equitable duties to those individuals to protect and to safeguard their information from unauthorized disclosure.

23.    Defendant breached its common law, statutory, and contractual obligations to

Plaintiffs and Class Members by, *inter alia*, (i) failing to adequately review its marketing programs and web based technology to ensure the hospital website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share patient web-users' information; (iii) aiding, agreeing, and conspiring with third parties to intercept communications sent and received by Plaintiffs and Class Members; (iv) failing to obtain the written consent of Plaintiffs and Class Members to disclose their communications to Third Parties for Third Party and fourth party[5] use; (v) failing to protect communications and take steps to block the transmission of Plaintiffs' and Class Members' communications through the use of tracking technology; (vi) failing to warn Plaintiffs and Class Members; and (vii) otherwise failing to design and monitor its website to maintain the confidentiality and integrity of patient communications.

24.    As a result of Defendant's conduct, Plaintiffs and Class Members have suffered numerous injuries-in-fact and damages, as detailed herein, including: (i) invasion of privacy; (ii) loss of benefit of the bargain; (iii) diminution of value of private information; (iv) statutory damages; and (v) continued and ongoing risks to their private information.

25.    Plaintiffs seek to remedy these harms and bring causes of action for Negligence, Negligence Per Se, Violation of Comprehensive Computer Data Access and Fraud Act, Cal. Pen. Code § 502, Violation of Consumer Protection Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, Violation of Consumer Privacy Act, Cal. Civ. Code, §§ 1798.100, *et seq.*, Breach of Express and Implied Contract, Unjust Enrichment, Breach of Fiduciary Duty, Declaratory Judgment, Breach of Confidence, Violation of Invasion of Privacy Act, Cal. Pen. Code §§ 631, *et seq.*, Violation of Invasion of Privacy Act, Cal. Pen. Code §§ 632, *et seq.*, Violation of Invasion of Privacy Act, Cal. Pen. Code §§ 638, *et seq.*, Violations of the Electronic Communications Privacy

---

[5] The term "fourth party" is discussed in paragraphs 132-129 below.

CLASS ACTION COMPLAINT

Act ("ECPA"), 18 U.S.C. §§ 2511(1), *et seq.*, and Violations of the Electronic Communications

Privacy Act ("ECPA"), 18 U.S.C. §§ 2511(3)(a), *et seq.*

## PARTIES

26.     Plaintiff Jane Doe is a natural person and citizen of California, where she intends to remain. Plaintiff Jane Doe resides in Alameda, California. Plaintiff Doe is Defendant's patient and a victim of Defendant's unauthorized Disclosure of her communications.

27.     Plaintiff Jane Roe is a natural person and citizen of California, where she intends to remain. Plaintiff Jane Roe resides in Oakland, California. Plaintiff Jane Roe is Defendant's patient and a victim of Defendant's unauthorized Disclosure of her communications.

28.     Plaintiff Janet Doe is a natural person and citizen of California, where she intends to remain. Plaintiff Janet Doe resides in Oakland, California. Plaintiff Janet Doe is Defendant's patient and a victim of Defendant's unauthorized Disclosure of her communications.

29.     Plaintiff Janet Roe is a natural person and citizen of California, where she intends to remain. Plaintiff Janet Roe resides in Alameda, California. Plaintiff Janet Roe is Defendant's patient and a victim of Defendant's unauthorized Disclosure of her communications.

30.     Defendant AHS is integrated public health care system in Alameda County, California. Defendant has its principal place of business in Oakland, California. Defendant transacts or has transacted business in this District and throughout the United States.

## JURISDICTION AND VENUE

31.     This Court has personal jurisdiction over Defendant because, personally or through its agents, Defendant operates, conducts, engages in, or carries on a business in this State, maintains corporate offices in California, and committed tortious acts in this State.

32.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) because this

is a class action wherein the amount in controversy exceeds $5,000,000, exclusive of interest and costs. Complete diversity exists between Defendant and at least one member of the proposed Classes, and there are more than one hundred (100) members in the proposed Classes.

33.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 because it arises under the laws of the United States. The Court has supplemental jurisdiction over Plaintiffs' claims arising under state law pursuant to 28 U.S.C. § 1367.

34.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this district and continue to occur in this district.

## COMMON FACTUAL ALLEGATIONS

### A. Alameda Health System

35.     Defendant AHS "is an integrated public health care system of five hospitals and four wellness centers with over 800 beds and 1,000 physicians."[6]

36.     Defendant encourages patients to use its website, https://www.alamedahealthsystem.org/ along with its various web-based tools and services (the "website"), to search for physicians, locate treatment facilities,[7] learn about specific health conditions and treatment options,[8] pay bills, access the patient portal,[9] access a billing questions

---

[6] *About Us – Alameda Health System*, https://www.alamedahealthsystem.org/about-us/ (last visited Jul. 2, 2024).

[7] *Locations - Alameda Health System,* https://www.alamedahealthsystem.org/locations/ (last visited Jul. 2, 2024).

[8] *See Services – Alameda Health System,* https://www.alamedahealthsystem.org/services/ (last visited Jul. 2, 2024).

[9] *MyChart – Login Page*, https://www.my-ahs.org/MyChart/Authentication/Login? (last visited Jul. 2, 2024).

form,[10] access a guest payment page,[11] and more.

37.    Defendant serves many of its patients via its website, which it encourages patients to use to search for physicians, locate treatment facilities,[12] learn about specific health conditions and treatment options,[13] pay bills, access the patient portal,[14] access a billing questions form,[15] access a guest payment page,[16] and more.

38.    Defendant promotes the comprehensive functionality of these tools and promotes their use, in service of its own goal of increasing profitability. In furtherance of that goal, Defendant purposely installed The Trade Desk tracker, the Google tracker, and other trackers onto its website, for the purpose of gathering information about Plaintiffs and Class Members to further its marketing efforts and profits. But Defendant did not only generate information for its own use: it also shared patient information, including private information belonging to Plaintiffs and Class Members, with The Trade Desk, Google, and other unauthorized third parties.

39.    As the very first thing a visitor sees when loading Defendant's website, Defendant displayed a cookie banner promising users meaningful control over whether their data would be shared. The banner clearly stated: "You can give your consent to all or selected purposes, or you

---

[10] *Contact Us – Billing – Alameda Health*, https://www.alamedahealthsystem.org/contact-us-billing/ (last visited Jul. 2, 2024).

[11] *MyChart – Pay as Guest*, https://www.my-ahs.org/MyChart/Billing/GuestPay (last visited Jul. 2, 2024).

[12] *Locations - Alameda Health System,* https://www.alamedahealthsystem.org/locations/ (last visited Jul. 2, 2024).

[13] *See Services – Alameda Health System,* https://www.alamedahealthsystem.org/services/ (last visited Jul. 2, 2024).

[14] *MyChart – Login Page*, https://www.my-ahs.org/MyChart/Authentication/Login? (last visited Jul. 2, 2024).

[15] *Contact Us – Billing – Alameda Health*, https://www.alamedahealthsystem.org/contact-us-billing/ (last visited Jul. 2, 2024).

[16] *MyChart – Pay as Guest*, https://www.my-ahs.org/MyChart/Billing/GuestPay (last visited Jul. 2, 2024).

can decline them all." This was a false choice. Even after visitors clicked "Decline all," Defendant continued to deploy tracking technologies that captured and transmitted their information to Third Parties like The Trade Desk and Google. The promise of privacy was not just broken, it was never honored in the first place.

40.    To better understand Defendant's unlawful data-sharing practices, a brief discussion of basic web design and tracking tools follows.

**B. The Types of Information Defendant Intercepted and Disclosed**

41.    The information that Defendant's Trackers sent to Third Parties like The Trade Desk and Google included private and confidential information that Plaintiffs and Class Members submitted to Defendant's website, including: the pages they viewed and the buttons they clicked; their status as medical patients; their searches for health conditions or concerns; and identifying information including IP addresses and identifying cookies (the "Disclosed Information"). This information allows third parties (*e.g.*, The Trade Desk or Google) to establish that a particular individual is seeking medical care, the specific condition or treatment in which they are interested (via their pageviews and searches), and their geographic location (Alameda). As alleged above, The Trade Desk shared the same Disclosed Information with over a dozen additional Third Parties. The Trade Desk, Google, and any third-party recipients of Plaintiffs' and Class Members' private information could reasonably infer from the Disclosed Information that a specific patient was being treated for a specific medical condition, such as cancer, pregnancy, dementia, or HIV. The identity of a patient and the condition for which they are being treated is highly sensitive and private. Defendant's unauthorized disclosure engenders a variety of harmful consequences, including social stigma, higher insurance rates, familial stress, and loss of trust in healthcare providers leading to under-diagnosis and treatment.

42.    The Disclosed Information includes both Protected Health Information ("PHI")[17] and Personally Identifying Information ("PII")[18] linking the Disclosed Information to a specific patient. The Disclosed Information includes browser-specific cookie IDs unique to each patient ("Unique ID Cookies"), as well as the IP address unique to each patient. The company AHS uses to implement its cookie consent regime is Piwik Pro. On its website, Piwik Pro acknowledges that both IP addresses and Unique-ID cookies are PII. The "pieces of information" that "are considered PII" include "Internet Protocol (IP) and Media Access Control (MAC) address or other host-specific persistent static identifier that consistently links to a particular person or small, well-defined group of people."[19] "That means cookies and device ID fall under the definition of PII."[20] In other words, the very company AHS uses to implement its cookie policy admits that the information AHS discloses without consent enables the Third Parties to identify the specific Class Member to which it pertains.

---

[17] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.*, and its implementing regulations ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103 *Protected health information*. "Business Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, DEP'T FOR HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/privacy/laws- regulations/index.html (last accessed Apr. 16, 2020). Genesis Health is clearly a "covered entity" and some of the data compromised in the Disclosure that this action arises out of is "protected health information," subject to HIPAA.
[18] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person." 17 C.F.R. § 248.201(b)(8).
[19] Karolina Lubowicka, et al. *What is PII, non-PII, and personal data? [UPDATED]* (pub. Aug. 6, 2024), https://piwik.pro/blog/what-is-pii-personal-data/ (last visited July 10. 2025).
[20] *Id.*

**C. Third Parties and Trackers: Collectors and Profiteers of Disclosed Information**

43.     The invisible Third Party online tracking technologies installed by Defendant on its website gather a vast assortment of patient data. The installation of these Trackers—and thus their transmission of data—is in Defendant's exclusive control.

44.     When an individual accesses a webpage containing online tracking technology from a third party, the trackers instantaneously and surreptitiously duplicate communications with that webpage and send them to the third party. The information travels directly from both the user's browser and the webpage owner's server and to the third party's server, based on instructions from the third party's tracker. The communications and information transmitted via these Trackers are entirely in Defendant's control. Patients trust Defendant with the information they input on Defendant's website. Defendant is in complete and exclusive control of its website and the data input therein.

45.     Accordingly, without any knowledge, authorization, or action by a patient, a website owner who has installed Third Party Trackers is using website source code to commandeer its patients' computing devices and web browsers, causing them to invisibly re-direct the patients' communications to Third Parties.

46.     In this case, Defendant employed the Third Party Trackers to intercept, duplicate, and re-direct Plaintiffs' and Class Members' communications to the Third Parties contemporaneously, invisibly, and without the patients' knowledge.

47.     Consequently, when Plaintiffs and Class Members visited Defendant's website and communicated their private information, that information was simultaneously intercepted and transmitted to the Third Parties.

48.     The Third Party Trackers do not provide any substantive content on Defendant's

website. Their only purpose is to collect and share information to be used for the Third Party and fourth parties' marketing and sales purposes.

49.    On information and belief, the Google trackers allow Defendant to track and share with Google (1) who uses Defendant's website; (2) whether the user is a patient of Defendant; (3) what actions the patient performs on the website such as that a patient is paying a bill or researching treatment; (4) when patients visit the website; (5) where on the website patients perform actions; and (6) how patients navigate through the website to perform these actions. Google gathers this information using trackers embedded on Defendant's website and generates corresponding reports.[21] On information and belief, Defendant installed Google Analytics,[22] which is used by Google to collect all of this. Google's collection of this data "enables advertisers to more effectively create, manage and grow high-impact digital marketing campaigns."[23] The Google trackers Defendant installed include a Google Analytics tracker with ID UA-37864886-1 ("GA1") and a second Google Analytics property with ID UA-76641-35 ("GA2"). On information and belief, the data Defendant sends to Google include cookies which are used by Google to identify and track users across website.

50.    Defendant also used The Trade Desk, which advertises itself as "[a]n objectively better way to advertise."[24] The Trade Desk "…[o]ffers advanced targeting based on demographics, behaviors, interests, and more. It also provides cross-device tracking through its Unified ID

---

[21] *See generally*, *A big list of what Google Analytics can & cannot do*, MarketLyrics, https://marketlytics.com/blog/list-of-things-google-analytics-can-and-cannot-do/ (last visited May 12, 2025).
[22] *See How Google Analytics works*, GOOGLE SUPPORT, https://support.google.com/analytics/answer/12159447?hl=en (last visited May 27, 2025).
[23] *See DoubleClick Digital Marketing*, Google Help, https://support.google.com/faqs/answer/2727482?hl=en (last visited May 12, 2025).
[24] *An objectively better way to advertise*, https://www.thetradedesk.com/ (last visited Jul. 10, 2024).

solution, ensuring a consistent view of users across devices."[25] The Trade Desk further offers "identity solutions" designed to identify individuals "without relying on third-party cookies," which allows advertisers "to optimize targeting" and "increase you campaigns' precision and scale."[26] The Trade Desk also offers an artificial intelligence to better measure and enhance the information it collects.[27] And The Trade Desk connects its users with their "ever-growing marketplace of premier providers," offering partnership with over 400 third parties.[28] On information and belief, The Trade Desk tracker is used *solely* for third-party interest-based marketing.

51.    On information and belief, the trackers Defendant installed from other Third Parties, including, Tapad, Adnxs, Media6Degrees, Nielson Online, Neustar Marketing, triplelift, Bombora, Merkle, Epsilon Marketing, GroupM, Semasio, LiveIntent, Rakuten, Narrative, MonsterInsights, and Full Circle Studies work similarly to The Trade Desk's tracker and likewise transmitted Plaintiffs' and the Class Members' communications without Plaintiffs' and Class Members' knowledge or authorization.

52.    Defendant used the Tapad tracker. Tapad "enables marketers to identify a brand patient or related household across multiple devices" which helps website owners to "maximize their digital marketing investment."[29]

---

[25]    *Improvado*, https://improvado.io/blog/trading-desk-guide#:~:text=The%20Trade%20Desk%3A%20Offers%20advanced,search%20history%20and%20browsing%20behavior (last visited Jul. 22, 2024).

[26]    *Identity Solutions | The Trade Desk*, https://www.thetradedesk.com/our-demand-side-platform/identity-solutions (last visited Jul. 10, 2024).

[27]    *AI for Advertising | The Trade Desk*, https://www.thetradedesk.com/our-demand-side-platform/ai-artificial-intelligence (last visited Jul. 10, 2024).

[28]    *Partner Directory | The Trade Desk*, https://www.thetradedesk.com/our-partners/partner-directory (last visited Jul. 10, 2024).

[29]    *See Tadpad | Homepage*, https://www.tapad.com/ (last visited Apr. 9, 2025).

53.     Defendant uses Adnxs, which is a cookie that tracks online activity and displays targeted ads. It can operate as a virus or malicious program, redirecting the browser to unwanted and unintended pages, programs, malware, or other intrusive and potentially harmful content.[30]

54.     Defendant used trackers from Media6Degrees, "[a] technology company that helps brands target Web users most likely to buy their products."[31]

55.     On information and belief, Defendant used the Nielson Online tracker, which provides it with a "clear view of your audience, brought together in one seamless platform."[32] It allows users like Defendant to "[k]now everything about your audiences with our cross-platform measurement data of the entire population and its shifting habits" and "[m]aximize your ROI by understanding how your advertising and marketing reaches and impacts audiences."[33]

56.     Defendant too used Neustar Marketing, which is "…now a part of TransUnion's newly unified B2B portfolio of solutions."[34] On information and belief, Neustar Marketing can track data which helps businesses improve their marketing, including:

- PII (Personally Identified Information)
- CRM data (customer relationship management data)
- Pseudonymous IDs including information linked to device-identified information DIIs such as cookies, mobile advertising IDs (MAIDs), statistical IDs, IP addresses, hashed email addresses or telephone numbers, and other third-party identifiers, including TV Identifiers, that do not, by themselves, identify a specific individual
- Attribute data

[30] *See How To Remove Adnxs.com Redirect [Virus Removal Guide]*, https://malwaretips.com/blogs/ib-adnxs-popup-virus/ (last visited Apr. 23, 2025).
[31] Forbes, *Media6Degrees*, avail. at https://www.forbes.com/companies/media6degrees/?sh=5027940fd36c (last visited Nov. 8, 2024).
[32] *Audience Is Everything*, https://www.nielsen.com/ (last visited Jul. 3, 2025).
[33] Id.
[34] *Trusted Connections at the Moments that Matter the Most | Nustar*, https://www.home.neustar/ (last visited Nov. 8, 2024).

- Geolocation data including but not limited to, latitude/longitude data. Neustar may disclose, sell, or share geolocation data in the course of delivering its services, including: Marketing Solutions; Risk Solutions; and Professional Services

- Log data, including Internet log data, and event data[35]

57.     The triplelift tracker Defendant uses is designed to "[a]chieve superior outcomes with our data and targeting technology, optimization, and data-driven insights."[36] It advertises itself as helping "[b]oost your revenue," "[l]ocate your audience," "[d]rive sales… boost your engagement," and provide "the best possible environment for optimal performance, benefitting both advertisers and publishers."[37]

58.     The Bombora tracker Defendant installed helps patients like Defendant "[f]ind the businesses who are ready to buy, before your competitors do" and "[c]onnect and sell using the industry's most comprehensive Intent data."[38] Bombora "[g]o[es] beyond targeting," and uses "funnel impact [to] [l]evel up your sales and marketing process."[39] It can "[i]dentify, enrich, and engage anonymous website traffic" by "decod[ing] [anonymous] traffic, turning the unknown into valuable first-party data for your business."[40] Bombora connects patients with numerous partners including Google and Artificial Intelligence partners.[41]

59.     Defendant used the Merkle tracker, which "is a predictive risk and intelligence

---

[35]     *See    Neustar    Privacy    Notice*,    July    1,    2024,    avail.    at https://www.transunion.com/privacy/neustar?atvy=%7B%22258139%22%3A%22Experience+B%22%7D (last visited Nov. 8, 2024).
[36] *TripleLift – The Creative SSP*, https://triplelift.com/ (last visited Jul. 3, 2025).
[37] Id.
[38] *B2B Data Provider for Intent, Audience & Identity | Bombora*, https://bombora.com/ (last visited Jul. 3, 2025).
[39] Id.
[40]    *Anonymous    website    Identity    Resolution    &    Data    Enrichment    |    Bombora*, https://bombora.com/identity-and-enrichment/ (last visited Jul. 3, 2025).
[41] *Partners – Bonbora*, https://bombora.com/all-partners/ (last visited Jul. 3, 2025).

platform" that "leverages behavioral analytics."[42]

60.     The Epsilon Marketing tracker Defendant used "help[s] brands deliver marketing" by "provid[ing] the data, technology and services," and "help[s] marketers…engage [consumers].[43] "Epsilon knows what a brands' potential patients want, what they buy, where to find them and when to engage them."

61.     GroupM, which Defendant used, is "the largest media investment group globally" and "provide[s] media planning and buying service[s]."[44]

62.     Defendant used the Semasio tracker, which "[m]aximize[s] advertising efficiency," by "[g]o[ing] beyond keywords with predictive intelligence that delivers accurate targeting."[45] It "[l]everage[s] an ID-agnostic future and reach consumers no matter how they are identified."[46]

63.     LiveIntent, used by Defendant, is advertising technology that focuses on identity resolution to "funnel" potential patients to targeted and measured advertisements.[47]

64.     Defendant also used the Rakuten pixel tracker, which uses a variety of tools and data, including cross-device tracking to identify users.[48] It connects with other platforms including Google Ad Manager.[49]

65.     On information and belief, Defendant used the Narrative tracker. The Narrative

---

[42] *Competitor tracker*, https://www.merklescience.com/competitor-tracker (last visited Jul. 3, 2025).

[43] *About Us | The leader in outcome-based marketing | Epsilon*, https://www.epsilon.com/us/about-us (last visited Jul. 3, 2025).

[44] *See patient-case-study-groupm.pdf*, available at https://www.tungsten-network.com/wp-content/uploads/2020/05/patient-case-study-groupm.pdf (last visited Jul. 3, 2025).

[45] *Semasiotm | Home*, https://www.semasio.com/ (last visited Jul. 3, 2025).

[46] *Id*

[47] *Marketer Solutions*, https://www.liveintent.com/marketer-solutions/ (last visited Aug. 8, 2024)

[48] *Tracking – Publisher Help Center*, https://pubhelp.rakutenadvertising.com/hc/en-us/sections/10619024947597-Tracking (last visited Jul. 3, 2025).

[49] Id.

Data Collaboration tracker is "AI-Enabled" to "[i]nstantly increase the value of data" and "[s]ave massive amounts of time & money."[50]

66.    MonsterInsights advertises that its product allows website hosts to "[g]et to [k]now [y]our [w]ebsite [v]isitors in a [w]hole [n]ew [w]ay" by tracking "which countries your visitors are from, what they are most interested in, which device they are using, their age, gender, and a whole lot more."[51]

67.    Defendant also uses Full Circle Studies, which is a "leader in the Internet market research industry…that studies and reports on Internet trends and behavior."[52] "Full Circle Studies works with web content providers and distributors to develop a census-level analysis of Internet usage."[53] "As part of this effort, participating content providers and distributors add a web beacon and cookie to their sites, allowing Full Circle Studies to collect general information about visitation patterns, leading to an understanding of overall Internet usage."[54]

68.    The collection and disclosure of users' data via these Trackers occurs automatically.

69.    On information and belief, each tracker installed on Defendant's website also sets its own cookies to help identify users on Defendant's website. Furthermore, the Trackers Defendant used support persistent user identification through a combination of browser cookies, browser metadata, and, in some cases, server-side identifiers. As part of their operation, IP addresses and browser characteristics (which may contribute to browser fingerprinting) are necessarily transmitted to the tracking platforms.

---

[50] *Drive growth with AI-Enabled Data Collaboration*, https://www.narrative.io/ (last visited Jul. 3, 2025).

[51] *MonsterInsights*, https://www.monsterinsights.com/ (last visited Aug. 16, 2023).

[52] *FullCircle Studies*, https://fullcirclestudies.com/home (last visited Jul. 3, 2025).

[53] Id.

[54] Id

**D. Defendant Used Trackers to Disclose Patients' Communications Without Their Authorization.**

70.    On information and belief, Defendant installed each of these trackers, through which Defendant transmitted patients' communications with Defendant's website to the Third Parties without patients' knowledge or authorization. This Disclosed Information included their browsing activities including the pages they viewed and the buttons they clicked; their status as medical patients; their searches for health conditions or concerns; and identifying information including IP addresses and identifying cookies.

71.    On information and belief, at least as early as April 1, 2023, and at least as recently as June 30, 2025, Defendant has had tracking technologies installed on its website. Accordingly, Defendant disclosed its patients' data to the Third Parties, like The Trade Desk and Google, beginning some time prior to April 2023 and continuing up until at least June 2025.

72.    The information and data collected by these Trackers allowed Third Parties like The Trade Desk and Google to identify individual users and link those patients to other online accounts, such as the patient's Facebook account.

i.    *Defendant Installed Meta Pixels to Track patients' Browsing Activities Across its website.*

73.    On information and belief, AHS deploys tracking and marketing technologies before users accept tracking on AHS's website. Significantly, AHS continues using tracking and marketing technologies even after users decline all tracking.

74.    Regardless of whether users consent to or decline AHS's tracking, AHS tracks users and shares information with Third Parties about users' (a) health concerns through users' search activities and (b) potential patient status through users' patient portal related activities.

75.    Additionally, AHS uses cookie syncing behavior via The Trade Desk tracker. AHS

configured The Trade Desk to sync users' cookies across a network of third-party The Trade Desk partners. By cookie syncing, The Trade Desk and its partners share users' various identifiers and users can thereby be identified as a single individual across different marketing platforms and websites. AHS engages in cookie syncing via The Trade Desk even after users explicitly decline all tracking.

> a.  *Brief History of AHS Tracking*

76.    AHS has installed tracking technology since as early as April 1, 2013, when its website was first archived. At that time, AHS installed a Google Analytics tracker with ID UA-37864886-1 ("GA1"). GA1 was configured to track user events such as link clicks, file downloads, and email link clicks.

77.    In late August 2017, AHS added a second Google Analytics property with ID UA-76641-35 ("GA2"). At this time AHS also added additional code to track when users viewed videos on AHS's website. GA2 was removed shortly after, by the end of September 2017.

78.    Between December 14 and 22, 2017, AHS started to configure GA1 to track various user behaviors via a Word Press plugin, MonsterInsights.

79.    The next major change occurred in January 2020, when the MonsterInsights plugin added code allowing AHS to offer users an opt-out mechanism for tracking. However, AHS never used this functionality and users were not given an option to decline tracking.

80.    Then, on November 10, 2024, AHS began installing The Trade Desk.

81.    Between May 30 and June 17, 2024, AHS began implementing Piwik Pro, the analytics tool it currently uses, which also powers the present cookie banner. It is reasonable to infer that the cookie banner in use today was introduced during this time.

82.    Finally, AHS removed GA1 between June 21 and August 15, 2024.

83.    Accordingly, AHS tracked users on its website via Google Analytics from at least as early as April 1, 2013 through June 21, 2024. In addition, AHS has tracked users through The Trade Desk beginning on November 10, 2024.

84.    AHS has likely displayed a cookie banner since November 10, 2024. However, as discussed more fully below, the banner has had little to no impact on the operation of AHS's tracking technologies.

ii.    *AHS's Tracking and Disclosure Behavior*

85.    AHS tracks users immediately upon loading its website – before they have a chance to respond to the cookie banner. This alone renders the opt-out process illusory. Even after users click "Decline all," tracking continues. Despite the appearance of choice via the cookie banner, AHS's data collection behavior is substantially the same whether a user accepts or declines tracking. From the moment the site loads, user data begins flowing through AHS to Third Parties.

86.    Even after users explicitly choose to "Decline all," AHS continues its tracking and data-sharing practices. This includes (i) ongoing disclosures to Third Parties such as The Trade Desk and Google, and (ii) continued cookie syncing via The Trade Desk. Notably, the "Decline all" action only disables IP address tracking in one tool, Piwik Pro. All other tracking, including identifiers that permit re-identification and targeted advertising, remains active. The opt-out banner is not just ineffective; it is affirmatively misleading.

87.    The fact that AHS selectively disables IP tracking for one vendor reveals two things: first, that AHS knew the information being collected was sensitive, and second, that it could have, but deliberately chose not to – disable the same tracking across other vendors.

88.    This selective implementation makes clear that Defendant cannot plausibly claim ignorance. By affirmatively disabling tracking for one vendor while continuing to share the same

type of information with others, Defendant demonstrated both awareness of the privacy implications and an ability to control the disclosures. It simply chose not to. That conscious choice – paired with the false promise that users could "decline all" – renders the cookie banner not just misleading, but deceptive by design.

### a. AHS Tracks Users Regardless of Users' Privacy Preferences

89.    AHS tracks users immediately upon users loading AHS' webpage. Despite the fact that users are prompted to select their privacy preferences via a cookie banner, AHS begins collecting tracking data before users make any selection or provide consent to be tracked.

90.    For example, when a user loads AHS's homepage, AHS immediately discloses the user's information to Piwik and The Trade Desk – even before the user provides their privacy preferences. Historically, AHS also disclosed user information to Google at the same point in the process. That means that a user's decision to decline tracking comes too late to prevent the collection or transmission of their private information.

91.    As the user clicks to decline all tracking, AHS turns off IP address tracking in Piwik Pro only and all other tracking remains active. No cookies are deleted and data sent to The Trade Desk continues to include the TDID and TDCPM cookies that The Trade Desk uses to identify users.

### b. AHS Discloses Users' Information to Third Parties

92.    Regardless of whether users decline tracking by AHS, AHS tracks users and discloses details about users' activities, revealing their health concerns and potential patient status to Third Parties.

### i. Health Concerns

93.    AHS discloses users' health concerns by sharing details about users' keyword

CLASS ACTION COMPLAINT

search activities.

94.    Users with health concerns can use AHS's search function to research various illnesses. When users conduct searches on AHS's website, AHS shares users' search keywords with Third Parties.

95.    For example, when a user searches for "breast cancer," AHS transmits events to The Trade Desk disclosing that the user searched for "s=breast+cancer." AHS would also have historically informed Google as the user performed such search, disclosing that the user "searched for breast cancer."

96.    As users interact with their search results, AHS continues to share details about the users' activities.

97.    If the user who searched for "breast cancer" scrolls to review their search results, AHS discloses to Piwik that the user scrolled "25%" of their search results page "for breast cancer – Alameda Health System."

98.    If the user then loads a page about AHS's breast clinic, AHS sends more events to Piwik and The Trade Desk. The events to Piwik reveal that the user first searched for "s=breast+cancer" and then loaded a page about AHS's "breast-clinic/."

99.    Historically, AHS would also have disclosed as the user loaded the Breast Clinic page, revealing that the user was viewing the page about "Breast Surgery &[] Breast Clinic – Alameda Health System."

100.    AHS continues to keep Piwik apprised of the user's activities as the user scrolls through the Breast Clinic page as well. When the user scrolls down, AHS sends another event to Piwik revealing that the user scrolled "25%" of the "Breast Surgery & Breast Clinic – Alameda Health System" page.

101.    If the user is interested in learning more about navigating breast cancer care as a patient and loads another page with more information about this, AHS sends yet another event to Piwik disclosing that the user is now on a page about "breast-clinic/patient-navigation."

### ii.    Patient Status

102.    AHS also shares users' patient portal related activities with Third Parties, revealing users' potential status as patients.

103.    Patients of AHS can access MyChart from AHS's website to manage their care online. To learn more about MyChart, users may navigate to AHS's page about MyChart.

104.    When a user loads AHS's page about the patient portal, AHS reports the user's activity by sending events to Piwik and The Trade Desk. The events indicate that the user is on the page, "https://www.alamedahealthsystem.org/mychart." Historically, AHS would likewise have informed Google about the user's navigation to the page, "MyChart Engage in Your Health – Alameda Health System."

105.    Furthermore, AHS also reveals when users scroll through the MyChart page, disclosing that the user scrolled through "25%" of the page, "MyChart Engage in Your Health – Alameda Health System."

### c.    Cookie Syncing via The Trade Desk

106.    Not only does AHS disclose users' health concerns and patient status to Third Parties regardless of users' privacy preferences, AHS also discloses users' persistent identifiers to Third Parties through a process known as cookie syncing.

107.    Cookie syncing enables the matching and linking of user identities across different websites and ad networks, facilitating cross-site tracking.

108.    AHS uses The Trade Desk tracker to engage in Cookie syncing.

109.    When a user loads a page on AHS's website, The Trade Desk attempts to synchronize its own user identifier cookie, known as TDID, with its third-party advertising partners. This process typically involves HTTP redirects or requests to partner domains, allowing each partner to associate its own unique identifier with the TDID. If a partner has not already set a cookie on the user's browser, it may do so during this interaction.

110.    The syncing process is distributed over the user's browsing session. This phased syncing is intended to reduce page load times and maintain responsiveness of the AHS website. On each page load, The Trade Desk may sync with up to five different partners. This incremental approach continues as the user navigates the site, gradually linking the TDID with additional advertising partners.

111.    Through this process, AHS syncs identifiers with Tapad, Adnxs, Media6Degrees, Nielson Online, Neustar Marketing, triplelift, Bombora, Merkle, Epsilon Marketing, GroupM, Semasio, LiveIntent, Rakuten, Narrative, and Full Circle Studies.

**E.  Defendant Uses Ambiguous, Disingenuous, and Deceptive Privacy Policies That Fail to Sufficiently Disclose or Notify Patients of Defendant's Data Sharing.**

*i.    Defendant's Privacy Representations*

112.    Patients never consented, agreed, authorized, or otherwise permitted Defendant to intercept their communications or to use or disclose it for marketing and profit purposes. patients were never provided with any written notice that Defendant disclosed their communications to Third Parties (who then allowed fourth parties to use it for profit).

113.    Patients relied on Defendant to keep their communications confidential and securely maintained and to use this information only for the purpose of providing legitimate healthcare services. Patients relied on Defendant to make only authorized disclosures of this information.

114.     Furthermore, Defendant actively misrepresented it would preserve the security and privacy of patients' communications.

115.     The contracts that Defendant has with its patients include the "Privacy and Patient Rights"[55], "Notice of Privacy Practices,"[56] and "Terms of Use"[57] (collectively, "Privacy Contracts").

116.     Defendant's Patient Rights sets forth "Our Responsibilities": "We are required by law to maintain the privacy and security of your protected health information." "We will let you know promptly if a breach occurs that may have compromised the privacy or security of your information." "We must follow the duties and privacy practices described in this notice and give you a copy of it." "We will not use or share your information other than as described here unless you tell us we can in writing. If you tell us we can, you may change your mind at any time. Let us know in writing if you change your mind."[58]

117.     Defendant's Patient Rights promises patients "[i]n these cases we never share your information unless you give us written permission: Marketing purposes; Sale of your information…"[59]

118.     Defendant's Notice is almost identical to the Patient Rights, and similarly promises confidentiality. "This notice describes how medical information about you may be used and disclosed and how you can get access to this information." "Uses and disclosures of health

---

[55] *Patients & Visitors – Alameda Health System,* https://www.alamedahealthsystem.org/patients-visitors/#fd45e55d27317c50f (last visited Jul. 3, 2025) ("*Patient Rights*") (attached as Exhibit A).
[56]          *AHS-Notice-of-Privacy-Practices,*          https://www.alamedahealthsystem.org/wp-content/uploads/2020/10/AHS-Notice-of-Privacy-Practices-FINAL-10-09-2020-English-1.pdf (last visited Jul. 3, 2025) ("*Notice*") (attached as Exhibit B).
[57] *Terms of Use – Alameda Health System*, https://www.alamedahealthsystem.org/terms-of-use/ (last visited Jul. 3, 2025) ("*Terms of Use*") (attached as Exhibit C).
[58] Patient Rights.
[59] Patient Rights.

information that are not discussed by this notice or required by law will only be made with your written permission." "Your written authorization will typically be required for most uses and disclosures of HIV test results, psychotherapy notes, if you receive treatment in a substance abuse program, and most uses and disclosures for marketing." "We comply with state and federal laws that require extra protection for your health information." "If you provide us permission to use or disclose health information about you, you may revoke that permission, in writing, at any time."[60]

119.     Defendant's Terms of Use promises that AHS "respects your personal privacy and is committed to protecting it." It tells patients that "It is not necessary to reveal your identity or any personal information to visit www.alamedahealthsystem.org." "We obtain personally identifiable information about you only when you intentionally provide that information."[61]

120.     AHS states unambiguously: "If you choose to provide Alameda Health System with personal information, we will never share, rent, trade, sell, or otherwise release this information without your consent, except if we are required to do so by law."

121.     The Terms of Use discuss cookies:

AHS's web site utilizes "cookies," small text files sent by our web server and stored on the user's computer. Cookies are used for authenticating, tracking, and maintaining specific information about users, such as the contents of the electronic "job cart" in the employment section of the site. Cookies can also track the number of people who visit our site from certain other web sites and how they utilize our web site. The cookies we use do not personally identify individuals by their name, email address, health status, or any other personal attribute.

Some general information about visitors to our site is collected automatically. This includes the domain from which you access the Internet (such as AOL or MSN); the web browser you use (such as Internet Explorer); the date and time of the visit to our site; and the pages that are visited. This information is used for statistical tracking purposes only, to help us improve our web site and provide visitors with a positive browsing experience. This information is only compiled in aggregate, so that we know how many people are visiting our site each day, how long people

---

[60] Notice.
[61] Terms of Use.

spend viewing our site, which pages are visited most, etc. This information will never be linked to your personal identity, used to contact you, or released to an outside entity in any way, unless you request that we do so (see the "Personal Information" section). Most web browsers automatically accept cookies, but provide an option for blocking the acceptance of cookies.

122.    Patients reasonably understand that Defendant will securely maintain their information entrusted to it and protect that information from being shared or used by Third Parties (and fourth parties) that have nothing to do with Defendant or its services. Defendant's Privacy Contracts only reinforced this reasonable understanding.

123.    In its Privacy Contracts, Defendant does not disclose that it shares patients' Personal Information with Third Parties for their advertising and marketing purpose, that Third Parties may share patients' communications with fourth parties.

ii.    *Defendant's Cookie Banner*

124.    Defendant's failure to safeguard the privacy of patients' communications as agreed in its Privacy Policies is even more egregious here, as Defendant also fails to provide patients with sufficient opportunity to opt out of Disclosure to Third Parties.

125.    When users visited Defendant's website, the very first thing they encountered was a cookie banner displayed prominently across the screen. The banner presented what appeared to be a meaningful choice about privacy. It stated: "You can give your consent to all or selected purposes, or you can decline them all." This message gave users the clear impression that they could prevent the website from tracking their behavior or disclosing their personal information simply by selecting "Decline all." That impression was false. In practice, Defendant continued to track users regardless of their choice. The "Decline all" button had almost no real effect. It merely activated a limited setting in one tracking tool, Piwik Pro, to anonymize IP addresses. All other

Trackers, including those operated by The Trade Desk and Google , remained active and continued collecting users' data.

126.    This selective disablement is especially revealing. It confirms that Defendant understood the data it was collecting, including IP addresses and session behavior, was sensitive and identifiable. It also demonstrates that Defendant had the technical ability to prevent tracking across vendors. Rather than honoring its promise to users, however, Defendant implemented a banner that gave the appearance of consent control while quietly ignoring it.

127.    The banner appeared as a pop-up overlay on the homepage, requiring users to interact with it before it would disappear:

128.    This conduct goes beyond passive negligence, it reflects an intentional mismatch between what patients are told and what actually occurs. The cookie banner is the first message a user sees, presented in language designed to instill confidence and signal compliance with privacy expectations. But the banner operates more as a shield than a safeguard: it gives the illusion of choice while concealing the fact that tracking will occur no matter what selection is made. This is not a technical oversight, it is a misrepresentation with legal and ethical consequences.

129.    Patients reasonably understand that Defendant will securely maintain their communications and Disclosed Information entrusted to it and protect that information from being shared or utilized by Third Parties (and fourth parties) that have nothing to do with Defendant or its services. Defendant's Privacy Contracts only reinforced this reasonable understanding.

130.    In contrast to this reasonable understanding, Defendant indiscriminately shares patients' communications and Disclosed Information with nonaffiliated Third Parties, without patients' consent and for Third Party and fourth party marketing purposes that have nothing to do with servicing consumers' Defendant accounts.

131.    This conduct was not a mere misconfiguration or oversight. It was a deliberate choice to present a false opt-out mechanism while continuing to monetize patient data. That is especially troubling in the healthcare context. Visitors to AHS's website were seeking medical care. They reasonably believed that a health care provider like Defendant would honor their requests for privacy, especially when those requests were explicitly acknowledged on the homepage. Instead, Defendant exploited that belief and used it to collect and disclose deeply personal information for commercial gain.

iii.    *Third-Parties Further Share the Data and Information Collected from Trackers Installed on Defendant's website with Fourth Parties.*

132.    On information and belief, in addition to using the data for their own purposes, the

Third Parties that obtain patient data and information from Trackers installed on Defendant's website further profit from Defendant's improper sharing practices by selling patients' data to fourth parties.

133.    As one study found, "on average, companies that allow external sharing of [] data assets have data that has been exposed to 42 4th-party domains."[62]

134.    Consequently, a fourth party that did not have a tracker directly installed on the Defendant's website may obtain and use information collected via third-party trackers to provide direct advertisements to patients on the fourth party's platform.

135.    One common fourth party recipient of patients' collected data is Facebook.

136.    For example, Facebook and Google have engaged in practices that allowed for the sharing or accessibility of user data between their platforms.[63] Because of this, advertisements on Facebook may reflect information collected via a Google tracker, either because of information shared directly or indirectly between the companies.

137.    Facebook and Google both act as data brokers, meaning they collect data, compile

---

[62] Adam Gavish, *Your 3rd Party Collaborators Share Your Company's Data with 4th Parties*, DoControl (Feb. 27, 2025), https://www.docontrol.io/blog/your-3rd-party-collaborators-share-your-company-data-with-4th-parties#:~:text=What%20is%204th%2DParty%20Data,side%20effect%20of%20SaaS%20collaboration.

[63] *See* Steven Musil, *Facebook gave tech giants more access to users data than it said*, CBSNEWS (Dec. 19, 2018), https://www.cbsnews.com/news/facebook-gave-tech-giants-more-access-to-users-data-than-it-said-new-york-times/ (last visited Apr. 24, 2025); Steven Musil, *Facebook acknowledges it shared user data with dozens of companies* (Jul. 1, 2018), https://www.cnet.com/tech/tech-industry/facebook-acknowledges-it-shared-user-data-with-dozens-of-companies/ (last visited Apr. 24, 2025); Paresh Dave and Katie Paul, *Google secretly gave Facebook perks, data in ad deal* (Dec. 17, 2020), https://www.reuters.com/article/technology/google-secretly-gave-facebook-perks-data-in-ad-deal-us-states-allege-idUSKBN28Q37G/ (last visited Apr. 24, 2025).

it into datasets, and sell it to third parties.[64] Two other popular data brokers are Acxiom and Oracle Data Cloud ("Oracle"). Facebook and Google have been known to buy information from, and sell information to, such data brokers.[65]

138.    Because of this, one company's tracker (e.g., Google Analytics) may collect information, compile it into a dataset (owned by Google), and act as a data broker to sell it to a third-party (e.g., Facebook), which uses the information to advertise for various parties (like other healthcare institutions) on its own platform.[66] Alternatively, one company's tracker (e.g., Google Analytics) may collect information, compile it into a dataset (owned by Google), and act as a data broker to sell it to a fourth-party advertiser (e.g., another healthcare institution), which uses the information to advertise for on other platforms (e.g., Facebook).[67] Or, one company's tracker (e.g., Google Analytics) may collect information, sell either the raw data or a compiled dataset to a third-party data broker (e.g., Acxiom or Oracle), which third party data broker sells the information to a fourth party (e.g., Facebook), which uses the information for still other parties' targeted advertising.[68] In any event, the basic idea and results are the same. Google Analytics tracks and discloses information to fourth parties that use that data and information to advertise a variety of products on a variety of platforms.

---

[64] *See* Jessie G Taft, *Facebook and Google Are the New Data Brokers* (Dec. 18, 2018, updated Jan. 5, 2021), https://dli.tech.cornell.edu/post/facebook-and-google-are-the-new-data-brokers (last visited Apr. 24, 2025).

[65] *See* Kalev Leetaru, *The Data Brokers So Powerful Even Facebook Bought Their Data* (Apr. 5, 2018), https://www.forbes.com/sites/kalevleetaru/2018/04/05/the-data-brokers-so-powerful-even-facebook-bought-their-data-but-they-got-me-wildly-wrong/ (last visited Apr. 24. 2025).

[66] *See* Don Marti, *et. al.*, *Who Shares Your Information With Facebook?* at 16 (Jan. 2024), https://innovation.consumerreports.org/wp-content/uploads/2024/01/CR_Who-Shares-Your-Information-With-Facebook.pdf (explaining how Facebook uses aggregated data from external data brokers to target users on its platform).

[67] *Id*.

[68] *See* Leetaru, The Data Brokers So Powerful Even Facebook Bought Their Data.

139.    The information that data brokers like Acxiom and Oracle buy and compile from trackers (like Facebook's and Google's tackers) is inherently sensitive.

**F.    Plaintiffs' Experiences**

*i.       Plaintiff Jane Doe*

140.    Plaintiff Jane Doe has been Defendant's patient since in or around 2020 and has received healthcare services, including regular checkups, since she visited Defendant's website.

141.    Plaintiff Jane Doe began using Defendant's website since she began visiting Defendant, and as recently as within the last year. Plaintiff Jane Doe used Defendant's website for getting information on visits, researching treatments, and visiting the patient portal.

142.    On information and belief, Plaintiff Jane Doe was presented with the cookie banner on Defendant's website, and consistent with her normal practice of routinely declining cookies when offered the choice, she clicked the "Decline all" option.

143.    Plaintiff is a Facebook user. After Plaintiff used Defendant's website, targeted advertisements began appearing on her Facebook page related to the information she input on Defendant's website.

144.    Plaintiff Jane Doe accessed Defendant's website at Defendant's direction and encouragement in relation to her past, present, and future health and healthcare needs.

145.    Plaintiff Jane Doe reasonably expected that her online communications with Defendant were confidential, solely between himself and Defendant, and that, as such, those communications would not be transmitted to or intercepted by a Third Party.

146.    Plaintiff provided information to Defendant and trusted that the information would be safeguarded according to Defendant's Privacy Policies, industry standards, the representations in Defendant's cookie banner, and the law.

147.    Plaintiff never intended to sell her communications or Disclosed Information, nor would she have permitted it to be made available for sale on the resale market.

148.    On information and belief, through their use of The Trade Desk trackers, Google trackers, and other trackers, Defendant disclosed to Third Parties like The Trade Desk and Google:

     a.  The pages and content Plaintiff viewed;

     b.  Plaintiff's seeking of medical treatment;

     c.  Plaintiff's status as a patient;

     d.  Plaintiff's search terms; and,

     e.  Plaintiff's identifying information, including IP addresses and "c_user" cookies.

ii.    *Plaintiff Jane Roe*

149.    Plaintiff Jane Roe has been Defendant's patient since in or around 2018 and has received healthcare services, including primary care and specialists, including for urology, dermatology, and bowel obstruction, since she visited Defendant's website.

150.    Plaintiff Jane Roe began using Defendant's website since she began visiting Defendant, and as recently as 2022. Plaintiff Jane Roe used Defendant's website to search for specialists, find a doctor, schedule appointments, pay for medical services, research treatments, and visit the patient portal.

151.    On information and belief, Plaintiff Jane Roe was presented with the cookie banner on Defendant's website, and consistent with her normal practice of routinely declining cookies when offered the choice, she clicked the "Decline all" option.

152.    Plaintiff Jane Roe accessed Defendant's website at Defendant's direction and encouragement in relation to her past, present, and future health and healthcare needs.

153.    Plaintiff Jane Roe reasonably expected that her online communications with

Defendant were confidential, solely between himself and Defendant, and that, as such, those communications would not be transmitted to or intercepted by Third Parties.

154.    Plaintiff provided her information to Defendant and trusted that the information would be safeguarded according to Defendant's Privacy Policies, industry standards, the representations in Defendant's cookie banner, and the law.

155.    Plaintiff never intended to sell her communications or Disclosed Information, nor would she have permitted it to be made available for sale on the resale market.

156.    On information and belief, through their use of the Trackers, Defendant disclosed to Third Parties like The Trade Desk and Google:

    a.    The pages and content Plaintiff viewed;

    b.    Plaintiff's seeking of medical treatment;

    c.    Plaintiff's status as a patient;

    d.    Plaintiff's search terms; and,

    e.    Plaintiff's identifying information, including IP addresses and "c_user" cookies.

*iii.    Plaintiff Janet Doe*

157.    Plaintiff Janet Doe has been Defendant's patient since in or around 1991 and has received healthcare services. In the past she used Defendant for her primary care physician. At present she uses Defendant primarily for specialists, including obstetrics and gynecology.

158.    Plaintiff Janet Doe has visited Defendant's website regularly and as recently as within the last month. Plaintiff Janet Doe used Defendant's website to search for specialists, find a doctor, schedule appointments, research treatments, and visit the patient portal.

159.    On information and belief, Plaintiff Janet Doe was presented with the cookie banner on Defendant's website, and consistent with her normal practice of regularly rejecting cookies, she

clicked the "Decline all" option. Plaintiff protects her online information. She has never paid a bill online because she doesn't trust putting in her payment information to websites.

160.    Plaintiff is a Facebook user, and a user of other social media platforms. Plaintiff has noticed medical advertising across her social media accounts.

161.    Plaintiff Janet Doe accessed Defendant's website at Defendant's direction and encouragement in relation to her past, present, and future health and healthcare needs.

162.    Plaintiff Janet Doe reasonably expected that her online communications with Defendant were confidential, solely between himself and Defendant, and that, as such, those communications would not be transmitted to or intercepted by Third Parties.

163.    Plaintiff provided her information to Defendant and trusted that the information would be safeguarded according to Defendant's Privacy Policies, industry standards, and the law.

164.    Plaintiff never intended to sell her communications or Disclosed Information, nor would she have permitted it to be made available for sale on the resale market.

165.    On information and belief, through their use of the Trackers, Defendant disclosed to Third Parties like The Trade Desk and Google:

      a.    The pages and content Plaintiff viewed;

      b.    Plaintiff's seeking of medical treatment;

      c.    Plaintiff's status as a patient;

      d.    Plaintiff's search terms; and,

      e.    Plaintiff's identifying information, including IP addresses and "c_user" cookies.

iv.    *Plaintiff Janet Roe*

166.    Plaintiff Janet Roe has been Defendant's patient since in or around 2023 and has received healthcare services, including regular checkups and the emergency room, since she visited

Defendant's website.

167.    Plaintiff Janet Roe began using Defendant's website since she began visiting Defendant, and as recently as within the last year. Plaintiff Jane Doe used Defendant's website for researching doctors and treatments, scheduling appointments, and visiting the patient portal.

168.    On information and belief, Plaintiff Janet Roe was presented with the cookie banner on Defendant's website, and consistent with her normal practice of routinely declining cookies when offered the choice, she clicked the "Decline all" option.

169.    Plaintiff Janet Roe accessed Defendant's website at Defendant's direction and encouragement in relation to her past, present, and future health and healthcare needs.

170.    Plaintiff Janet Roe reasonably expected that her online communications with Defendant were confidential, solely between himself and Defendant, and that, as such, those communications would not be transmitted to or intercepted by Third Parties.

171.    Plaintiff provided her information to Defendant and trusted that the information would be safeguarded according to Defendant's Privacy Policies, industry standards, the representations in Defendant's cookie banner, and the law.

172.    Plaintiff never intended to sell her communications or Disclosed Information, nor would she have permitted it to be made available for sale on the resale market.

173.    On information and belief, through their use of the Trackers, Defendant disclosed to Third Parties like The Trade Desk and Google:

     a.  The pages and content Plaintiff viewed;

     b.  Plaintiff's seeking of medical treatment;

     c.  Plaintiff's status as a patient;

     d.  Plaintiff's search terms; and,

e.  Plaintiff's identifying information, including IP addresses and "c_user" cookies.

174.    Plaintiffs accessed Defendant's website at Defendant's direction and encouragement.

175.    Plaintiffs and the Class Members visited Defendant's website in relation to their past, present, and future health, healthcare and/or payment for health care. When Plaintiffs and Class Members used Defendant's website, they thought they were communicating exclusively with their trusted healthcare provider.

176.    Plaintiffs relied on Defendant's website to communicate and did so with the understanding that Defendant would not share their communications or Disclosed Information except as agreed in the Privacy Contracts.

177.    At no point did patients like Plaintiffs sign any written authorization permitting Defendant to send their communications or Disclosed Information to Third Parties (or fourth parties) uninvolved in providing them with healthcare.

178.    Plaintiffs reasonably expected that their communications with Defendant were confidential, solely between each Plaintiff and Defendant, and that, as such, those communications and any information submitted would not be transmitted to or intercepted by third parties (or used by a fourth party).

179.    Plaintiffs provided their information to Defendant and trusted that the information would be safeguarded according to Defendant's promises and the law.

180.    Had they been aware of Defendant's sharing practices, Plaintiffs would not have authorized Defendant to make their communications and Disclosed Information available for sale on the resale market.

181.    Plaintiffs never intended to let Defendant benefit from their communications and

41
CLASS ACTION COMPLAINT

Disclosed Information.

182.    Through the systematic data sharing process described in this complaint, Plaintiffs' interactions with Defendant's website were disclosed to Third Parties, including The Trade Desk and Google. Plaintiffs did not consent to those disclosures.

183.    By failing to receive the requisite consent, Defendant breached confidentiality and unlawfully disclosed Plaintiffs' communications and Disclosed Information.

184.    Plaintiffs would not have submitted their information to Defendant if they had known it would be shared with Third Parties and fourth.

185.    As a result of Defendant's Disclosure of Plaintiffs' communications and Disclosed Information to Third Parties (and fourth parties) without authorization, Plaintiffs were harmed in the following ways:

    a.  Loss of privacy;

    b.  Unauthorized disclosure of their communications and Disclosed Information;

    c.  Unauthorized access to their communications and Disclosed Information by Third Parties;

    d.  Defendant benefited from the use of Plaintiffs' communications and Disclosed Information without sharing that benefit with Plaintiffs;

    e.  Lost benefit of their bargain with Defendant, as Plaintiffs did not receive the reasonable privacy and data security protections for which they paid;

    f.  Defendant enriched itself at Plaintiffs' expense without sharing the revenue, profit, and/or cost-savings attributable to collecting Plaintiffs' communications and Disclosed Information without authorization and sharing it with Third Parties (and fourth parties);

g.  Defendant profited from collecting and disclosing Plaintiffs' communications and Disclosed Information without authorization through one or more mechanisms, as-yet unknown to Plaintiffs, which may include: (1) direct payments from Third Parties, including The Trade Desk and Google, (2) free or reduced cost for services, including services related to the implementation and monitoring of the AHS website, and/or (3) the ability to purchase ad space on other websites at a reduced price or at a greater value for the same price;

h.  Plaintiffs lost their ability to keep their communications and Disclosed Information private;

i.  Embarrassment, humiliation, frustration, and emotional distress;

j.  Decreased value of Plaintiffs' communications and Disclosed Information;

k.  Increased risk of future harm resulting from future use and disclosure of their communications and Disclosed Information; and

l.  Statutory damages.

## G.  Defendant Violated HIPAA Standards

186.  Information about a person's physical and mental health is among the most confidential and sensitive information in our society, and the mishandling of medical information can have serious consequences, including discrimination in the workplace and denial of insurance coverage. If people do not trust that their medical information will be kept private, they may be less likely to seek medical treatment, which can lead to more serious health problems down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to anyone other than the person's medical provider is necessary to maintain public trust in the healthcare system as a whole.

187.    Recognizing these facts, and in order to implement requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), HHS has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect private information like that Plaintiffs and Class Members communicated on Defendant's website.

188.    Under HIPAA, a healthcare provider may not disclose personally identifiable, non-public medical information (PHI) about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[69]

189.    Guidance from the United States Department of Health and Human Services instructs healthcare providers that patient status alone is protected by HIPAA.

190.    In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the Department instructs:

191.    Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data. If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[70]

---

[69] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

[70] Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule, U.S. Department of Health and Human Services (Nov. 26, 2012) https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

192.    In its guidance for Marketing, the Department further instructs:

The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or him protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list. (Emphasis added).[71]

193.    In addition, in December 2022, the Office for Civil Rights (OCR) at the U.S. Department of Health and Human Services (HHS) issued a Bulletin to highlight the obligations of HIPAA-covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online tracking technology.[72] (the "December 2022 Bulletin").[73]

194.    Therein, HHS defined tracking technologies, explaining:

Tracking technologies are used to collect and analyze information about how users interact with regulated entities' website or mobile applications ("apps"). For example, a regulated entity may engage a technology vendor to perform such analysis as part of the regulated entity's health care operations. The HIPAA Rules apply when the information that regulated entities collect through tracking technologies or disclose to tracking technology vendors includes protected health information (PHI). Some regulated entities may share sensitive information with

---

[71]    *Marketing*, U.S. Department of Health and Human Services, (Dec. 3, 2002) https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf.

[72] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. Department of Health and Human Services, https://www.hhs.gov/hipaa/forprofessionals/privacy/guidance/hipaa-online-tracking/index.html.

[73] *See* archived version of the December 2022 Bulletin at HHS Office for Civil Rights Issues Bulletin on Requirements under HIPAA for Online Tracking Technologies to Protect the Privacy and Security of Health Information, HHS.gov (Dec. 1, 2022), https://web.archive.org/web/20221201192812/https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Mar. 30, 2024).

online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors.[74]

195.    In the Bulletin, HHS was clear in unambiguous terms that, "[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures."[75,76]

196.    On March 18, 2024, HHS updated its December 2022 bulletin, "to increase clarity for regulated entities and the public" and reiterating the above basic privacy obligations.[77,78]

197.    Citing The Markup's June 2022 article, the Bulletin expressly notes:

Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors. **Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.** For example, disclosures of PHI to tracking technology vendors or marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.

198.    An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss,

---

[74] *Id.*

[75] *Id.* (bold emphasis in original)

[76] Citing *to* 45 CFR 164.508(a)(3); s*ee also* 45 CFR 164.501 (definition of "Marketing").

[77] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. Dept. of Health and Human Svcs. Office for Civil Rights, (Dec. 1, 2022, updated Mar. 18, 2024), available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited June 20, 2024).

[78] On June 20, 2024, in *American Hospital Association, et al. v. Xavier Becerra, et al.,* Case No. 4:23-cv-01110-P (N.D. Tx., Jun. 20, 2024, Doc. 67), the U.S. District Court for the Northern District of Texas vacated HHS's March 14, 2024 Bulletin as to the "Proscribed Combination," *but* acknowledged that the Proscribed Combination could be PHI in certain circumstances.

discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule. [79]

199.    In other words, HHS has expressly stated that Defendant's conduct of implementing tracking technologies is a violation of HIPAA Rules.

### H. Defendant Violated FTC Standards and the FTC and HHS Take Action

200.    The Federal Trade Commission ("FTC") has also recognized that implementation of tracking technologies pose "serious privacy and security risks" and "impermissibly disclos[e] consumers' sensitive personal health information to third parties."[80]

201.    The OCR and the FTC warn about the "serious privacy and security risks related to the use of online tracking technologies" present on websites such as Defendant's, that "impermissibly disclos[e] consumers' sensitive personal health information to third parties."[81] OCR and FTC agree that such tracking technologies, like those present on Defendant's website, "can track a user's online activities" and "gather identifiable information about users as they

---

[79] *Id.* (emphasis in original) (internal citations omitted).

[80] *Re: Use of Online Tracking Technologies*, U.S. Dep't of Health & Human Services, (July 20, 2023) (available at https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf).

[81] *Re: Use of Online Tracking Technologies*, U.S. Dep't of Health & Human Services (July 20, 2023), available at https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf (last visited April 9, 2024).

interact with a website or mobile app, often in ways which are not avoidable by and largely unknown to users."[82] OCR and FTC warn that

> Impermissible disclosures of an individual's personal health information to third parties may result in a wide range of harms to an individual or others. Such disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more. In addition, impermissible disclosures of personal health information may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others.[83]

202.    On July 20, 2023, the FTC and HHS sent a "joint letter to approximately 130 hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as Meta/Facebook pixel and Google Analytics, that can track a user's online activities."[84]

203.    Therein, the FTC reminded healthcare providers that "HIPAA regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to third parties or any other violations of the HIPAA Rules"[85] and that "[t]his is true even if you relied upon a third party to develop your website or mobile app and even if you do not use the information obtained through use of a tracking technology for any marketing purposes."[86]

204.    Entities that are not covered by HIPAA also face accountability for disclosing

---

[82] *Id.*

[83] *Id.*

[84] *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, Federal Trade Commission (July 20, 2023) https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking?utm_source=govdelivery.

[85] *Id.*

[86] *Id.*

consumers' sensitive health information under the Health Breach Notification Rule. 16 C.F.R. § 318. This Rule requires that companies dealing with health records notify the FTC and consumers if there has been a breach of unsecured identifiable health information, or else face civil penalties for violations. *Id*. According to the FTC, "a 'breach' is not limited to cybersecurity intrusions or nefarious behavior. Incidents of unauthorized access, *including sharing of covered information without an individual's authorization*, triggers notification obligations under the Rule."[87]

205.    Additionally, the FTC Act makes it unlawful to employ "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" 15 U.S.C. § 45(a). According to the FTC, "the disclosure of [sensitive health] information without a consumer's authorization can, in some circumstances, violate the FTC Act as well as constitute a breach of security under the FTC's Health Breach Notification Rule."[88]

206.    As such, the FTC and HHS have expressly stated that conduct like Defendant's runs afoul of the FTC Act and/or the FTC's Health Breach Notification Rule.

207.    On March 18, 2024, HHS updated its December 2022 bulletin in the "March 2024 Bulletin," expanding the circumstances in which HHS would consider information from any unauthenticated website visitor to be considered PHI, and its disclosure to be a violation of

---

[87] *Statement of the Commission: On Breaches by Health Apps and Other Connected Devices,* U.S. Fed. Trade Commission, (Sept. 15, 2021) (available at https://www.ftc.gov/system/files/documents/public_statements/1596364/statement_of_the_commission_on_breaches_by_health_apps_and_other_connected_devices.pdf) (emphasis added).

[88] *See, e.g., U.S. v. Easy Healthcare Corp.*, Case No. 1:23-cv-3107 (N.D. Ill. 2023); *In the Matter of BetterHelp, Inc.,* FTC Dkt. No. C-4796 (July 14, 2023); *U.S. v. GoodRx Holdings, Inc.,* Case No. 23-cv-460 (N.D. Cal. 2023); *In the Matter of Flo Health Inc.,* FTC Dkt. No. C-4747 (June 22, 2021).

HIPAA.[89,90]

208.    The March 2024 Bulletin added guidance on when the disclosure of individually identifiable health information ("IIHI") is impermissible under HIPAA, explaining that: "the mere fact that an online tracking technology connects the IP address of a user's device (or other identifying information) with a visit to a webpage addressing specific health conditions or listing health care providers is not a sufficient combination of information to constitute IIHI *if the visit to the webpage is not related to an individual's past, present, or future health, health care, or payment for health care*."[91]

209.    However, in contrast, when a user visits a website related to his or her past, present, or future health, health care, or payment for health care, such as "…looking at a hospital's webpage listing its oncology services to seek a second opinion on treatment options for their brain tumor, the collection and transmission of the individual's IP address, geographic location, or other identifying information showing their visit to that webpage is a disclosure of PHI to the extent that the information is both identifiable and related to the individual's health or future health care[,]" such that the disclosure of their information would be PHI, HIPAA rules apply, and that disclosure would be a violation of HIPAA.[92]

---

[89] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. Dept. of Health and Human Svcs. Office for Civil Rights, (Dec. 1, 2022, updated Mar. 18, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited June 21, 2024).

[90] On June 20, 2024, in *American Hospital Association, et al. v. Xavier Becerra, et al.,* Case No. 4:23-cv-01110-P (N.D. Tx., Jun. 20, 2024, Doc. 67), the U.S. District Court for the Northern District of Texas vacated HHS's March 14, 2024 Bulletin as to the "Proscribed Combination," *but* acknowledged that the Proscribed Combination could be PHI in certain circumstances.

[91] *Id.* (bold, italicized emphasis added).

[92] Id.

### I. Defendant Violated Industry Standards

210.    A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

211.    The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications, which are applicable to Defendant and its physicians.

212.    AMA Code of Ethics Opinion 3.1.1 provides:

Protecting information gathered in association with the care of the patient is a core value in health care . . . . Patient privacy encompasses a number of aspects, including . . . personal data (informational privacy).

213.    AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

214.    AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically . . . must . . . release patient information only in keeping ethics guidelines for confidentiality.

### J. Plaintiffs' and Class Members' Expectation of Privacy

215.    At all times when Plaintiffs and Class Members provided their communications and Disclosed Information to Defendant, they all had a reasonable expectation that the information would remain private and that Defendant would not share the communications or Disclosed

Information with Third Parties for a commercial marketing and sales purposes, unrelated to patient care.

**K.  IP Addresses and Cookie Identifiers are Personally Identifiable Information**

216.    Defendant also disclosed and otherwise assisted The Trade Desk and Google and potentially others with intercepting Plaintiffs' and Class Members' IP addresses using tracking technologies.

217.    An IP address is a number that identifies the address of a device connected to the Internet.

218.    IP addresses are used to identify and route communications on the Internet.

219.    IP addresses of individual Internet users, including Defendant's patients, are used by Internet service providers, website, and Third Party tracking companies to facilitate and track Internet communications.

220.    Google tracks every IP address ever associated with a Google user.

221.    Google tracks IP addresses for use of targeting individual homes and their occupants with advertising.

222.    Under HIPAA, an IP address is Personally Identifiable Information: HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses. *See* 45 C.F.R. § 164.514 (2).

223.    HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *See also*, 45 C.F.R. § 164.514(b)(2)(i)(O).

224.    The company Defendant uses to implement its cookie banner, Piwik Pro, defines cookies and IP addresses as Personally Identifiable information: "pieces of information" that "are

considered PII" include information "such as Internet Protocol (IP) and Media Access Control (MAC) address or other host- specific persistent static identifier that consistently links to a particular person or small, well-defined group of people."[93] "That means cookies and device ID fall under the definition of PII."[94]

225.    Consequently, by disclosing the IP addresses and/or cookies of Plaintiffs and the Class Members—patients of Defendant—Defendant's business practices violated HIPAA and industry privacy standards.

226.    Trackers like the one deployed by The Trade Desk also collect unique identifiers associated with a specific cookie. As The Trade Desk explains, these can be used for "cookie mapping" which "is a process of establishing the correlation between unique identifiers (IDs) for the same user in The Trade Desk platform and your platform."[95] "In other words, it is the process of mapping your unique cookie ID for a user to the Trade Desk cookie ID for the same user."[96] The Trade Desk's cookies are deliberately designed to "serve as a superior signal to cookies in myriad ways" in identifying individuals.[97] Thus by this method as well, Defendant disclosed Personally Identifiable Information.

227.    Consequently, by disclosing Plaintiffs' and the Class Members' cookies, Defendant's business practices violated HIPAA and industry privacy standards.

**L.  Defendant Was Enriched and Benefitted from the Use of Tracking Technologies and Unauthorized Disclosures**

---

[93] *What is PII, non-PII, and personal data? [UPDATED]* (pub. Aug. 6, 2024), Karolina Lubowicka, et al., https://piwik.pro/blog/what-is-pii-personal-data/ (last visited Jul. 10. 2025).
[94] *Id.*
[95] *Cookie Mapping*, https://partner.thetradedesk.com/v3/portal/ssp/doc/CookieMapping (last visited Jul. 10, 2025).
[96] *Id.*
[97] *Unified ID Solution 2.0 | The Trade Desk*, https://www.thetradedesk.com/unified-id-solution-2-0 (last visited Jul. 10, 2025).

228.    Defendant's use of tracking technology was for the tortious purpose of unauthorizedly disclosing Plaintiffs' and the Class Members' communications and Disclosed Information, and for breaching the contracts with said patients, all for marketing and profits.

229.    In exchange for disclosing the communications and Disclosed Information of their patients, on information and belief, Defendant are compensated by Third Parties like The Trade Desk and Google in the form of enhanced advertising services and more cost-efficient marketing on their platforms.

230.    Retargeting is a form of online marketing that targets users, including patients, with ads based on their previous internet communications and interactions. Upon information and belief, as part of their marketing campaign, Defendant re-targeted patients and potential patients.

231.    On information and belief, by using the trackers, the cost of advertising and retargeting was reduced, thereby benefiting Defendant.

**M. Plaintiffs' and Class Members' Communications and Disclosed Information Had Financial Value**

232.    The data concerning Plaintiffs and Class Members, collected and shared by Defendant, has tremendous economic value.

233.    As one court recently held, "[the Defendant] cannot seriously dispute that browsing history and data mined from individuals using the internet has significant economic value. If it did not have value, then entire industries that sell and trade this data would not exist. As [the plaintiff's expert] explained, there is an entire 'data industry' and estimates suggests that that industry 'now generates combined annual revenues of approximately $300 billion dollars.'" *Jane Doe et al v. Virginia Mason Medical Center*, No. 19-2-26674-1 SEA, 2024 WL 3517759 (Wash. Sup. Ct., June 6, 2024).

234.    Data collected via tracking technologies like the The Trade Desk and the Google

tracker allow Third Parties like The Trade Desk and Google, and in turn Facebook, to build their own massive, proprietary dataset, to which it then sells access in the form of targeted advertisements. Targeting works by allowing advertisers to direct their ads at particular "Audiences," subsets of individuals who, according to Facebook, are the "people most likely to respond to your ad."[98] Facebook's "Core Audiences" allow advertisers to target individuals based on demographics, such as age, location, gender, or language, whereas "Custom Audiences" allow advertisers to target individuals who have "already shown interest in your business," by visiting a business's website, using an app, or engaging in certain online content.[99] Facebook's "Lookalike Audiences" go further, targeting individuals who resemble current customer profiles and whom, according to Facebook, "are likely to be interested in your business."[100]

235.    Data harvesting is big business, and it drives Facebook's profit center, its advertising sales. In 2019, Facebook generated nearly $70 billion dollars in advertising revenue alone, constituting more than 98% of its total revenue for that year.[101]

236.    This business model is not limited to Facebook. Data harvesting one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil." Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 were as high as $434 per user, for a total of more than $200 billion industry wide.

---

[98] *Audience Ad Targeting*, Meta, https://www.facebook.com/business/ads/ad-targeting (last visited June 21, 2024).
[99] Id.
[100] *See How to Create a Lookalike Audience on Meta Ads Manager*, Meta Business Center, https://www.facebook.com/business/help/465262276878947 (last visited June 21, 2024).
[101] *See Here's How Big Facebook's Ad Business Really Is*, CNN, https://www.cnn.com/2020/06/30/tech/facebook-ad-business-boycott/index.html (last visited Aug. 14, 2023).

237.    In particular, the value of health data is well-known due to the media's extensive reporting on the subject. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry." Therein, Time Magazine described the extensive market for health data and observed that the health data market is both lucrative and a significant risk to privacy.[102]

238.    Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[103]

**TOLLING, CONCEALMENT, AND ESTOPPEL**

239.    The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

240.    Defendant seamlessly incorporated the Trackers into its website while providing patients using those platforms with no indication that their website usage was being tracked and transmitted to Third Parties. Defendant knew that its website incorporated the Trackers, yet it failed to disclose to Plaintiffs and Class Members that their sensitive communications and Disclosed Information would be intercepted, collected, used by, and disclosed to Third Parties.

241.    Even while exercising due diligence, Plaintiffs and Class Members could not have discovered the full scope of Defendant's conduct, because there were no disclosures or other indications that they were interacting with a website employing tracking technology to unauthorizedly disclose their communications and Disclosed Information to unaffiliated Third

---

[102] *See* Adam Tanner, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, Time, (Jan. 9, 2017 at 9:00 a.m.) https://time.com/4588104/medical-data-industry/.
[103] *See* Christina Farr, *Hospital Execs Say They are Getting Flooded with Requests for Your Health Data*, CNBC, (Dec. 18, 2019 at 8:27 a.m.) https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

Parties or that their information would subsequently be sold to fourth parties for the purpose of marketing Third and fourth party products.

242.    All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Defendant's illegal interception and disclosure of Plaintiffs' and the Class's communications and Disclosed Information has continued unabated. What is more, Defendant was under a duty to disclose the nature and significance of its data collection practices but did not do so. Defendant is therefore estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

243.    Plaintiffs bring this nationwide class action on behalf of themselves and on behalf of all other similarly situated persons pursuant to Fed. R. Civ. P. 23.

244.    Plaintiffs seek to represent the following classes:

**Nationwide Class**: All individuals in the United States within the applicable statute of limitations who clicked "Decline all" on Defendant's cookie banner and whose information was disclosed by Defendant to Third Parties through Defendant's website's tracking technology without authorization.

**California Subclass**: All citizens of California within the applicable statute of limitations who clicked "Decline all" on Defendant's cookie banner and whose information was disclosed by Defendant to Third Parties through Defendant's website's tracking technology without authorization.

245.    Excluded from the Classes are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers, and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

246.    Plaintiffs reserve the right to modify or amend the definition of the proposed classes

before the Court determines whether certification is appropriate.

247.     This action satisfies the numerosity, commonality, typicality, and adequacy requirements under Fed. R. Civ. P. 23(a)(1)-(4).

248.     <u>Numerosity</u>: Class Members are so numerous and geographically dispersed that joinder of all members is impracticable. Upon information and belief, there likely millions of individuals throughout the United States whose communications were improperly used or disclosed by Defendant, and the Classes are identifiable within Defendant's records.

249.     <u>Ascertainability</u>. Class Members are readily identifiable from information in Defendant's possession, custody, and control.

250.     <u>Commonality and Predominance</u>: Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

a.  Whether Defendant disclosed Class Members' communications or Disclosed Information to Third Parties;

b.  Whether Class Members consented to Defendant's disclosure of their communications or Disclosed Information;

c.  Whether Defendant owed duties to Plaintiffs and Class Members to protect their communications or Disclosed Information;

d.  Whether Defendant breached its duty to protect Plaintiffs' and Class Members' communications or Disclosed Information;

e.  Whether Defendant's disclosure of Plaintiffs' and Class Members' communications or Disclosed Information to Third Parties violated federal, state and local laws, or industry standards;

f.  Whether Defendant's failure to allow patients a meaningful opportunity to opt out

of sharing with Third Parties violated federal, state and local laws, or industry standards;

g.  Whether Defendant's conduct resulted in or was the actual cause of the disclosure of Plaintiffs' and Class Members' communications or Disclosed Information;

h.  Whether Defendant's conduct resulted in or was the proximate cause of the disclosure of Plaintiffs' and Class Members' communications or Disclosed Information;

i.  Whether Defendant has a contractual obligation to protect Plaintiffs' and Class Members' communications or Disclosed Information and whether it complied with such contractual obligation;

j.  Whether Defendant has a duty of confidence and whether it complied with such obligation;

k.  Whether Defendant's conduct amounted to violations of state consumer protection statutes;

l.  Whether Defendant's conduct amounted to violations of state and federal wiretap statutes;

m.  Whether Defendant's conduct amounted to violations of other California state laws;

n.  Whether Defendant should retain Plaintiffs' and Class Members' valuable communications or Disclosed Information;

o.  Whether, as a result of Defendant's conduct, Plaintiffs and Class Members are entitled to injunctive, equitable, declaratory and/or other relief, and, if so, the nature of such relief.

251.  Defendant has engaged in a common course of conduct toward Plaintiffs and the

Class Members, in that the Plaintiffs' and Class Members' data was stored on the same computer system and unlawfully disclosed and accessed in the same way. As set forth above, the common issues arising from Defendant's conduct affecting Class Members predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

252.    Typicality: Plaintiffs' claims are typical of those of other Class Members because all had their communications or Disclosed Information compromised as a result of Defendant's use and incorporation of, The Trade Desk trackers, Google trackers and other tracking technology.

253.    Policies Generally Applicable to the Classes: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Classes as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly, and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiffs.

254.    Adequacy: Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages Plaintiffs have suffered is typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intends to prosecute this action vigorously.

255.    Superiority and Manageability: Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other

available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

256.    The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged. If the class action device were not used, Defendant would necessarily gain an unconscionable advantage because it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources. Moreover, the costs of individual suits could unreasonably consume the amounts that would be recovered, whereas proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Classes and will establish the right of each Class Member to recover on the cause of action alleged. Finally, individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

257.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

258.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

259.    Unless a Class-wide injunction is issued, Defendant may continue in its unlawful use and disclosure and failure to properly secure the communications or Disclosed Information of Plaintiffs and the Class Members, Defendant may continue to refuse to provide proper notification to and obtain proper consent from Class Members, and Defendant may continue to act unlawfully as set forth in this Complaint.

260.    Moreover, Defendant has acted or refused to act on grounds generally applicable to the Classes, and, accordingly, final injunctive or corresponding declaratory relief regarding the whole of the Classes is appropriate.

261.    Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:

  a. Whether Defendant owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their communications or Disclosed Information;

  b. Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their communications or Disclosed Information;

  c. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to the disclosure of patient information;

  d. Whether Defendant was negligent and/or negligent *per se*;

e.   Whether an implied contract existed between Defendant on the one hand, and Plaintiffs and Class Members on the other, and the terms of that contract;

f.   Whether Defendant breached the contract;

g.   In the alternate, whether Defendant was unjustly enriched;

h.   Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their communications or Disclosed Information had been used and disclosed to Third Parties and used for Third Party and fourth parties' benefit;

i.   Whether Defendant failed to implement and maintain reasonable security procedures and practices;

j.   Whether Defendant invaded Plaintiffs and the Class Members' privacy;

k.   Whether Defendant breached its implied duty of confidentiality; and,

l.   Whether Plaintiffs and the Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

**COUNT I**
**NEGLIGENCE**
**(On Behalf of Plaintiffs and the Classes)**

262.   Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

263.   Plaintiffs and Class Members submitted sensitive nonpublic personal information, including communications and/or Disclosed Information, when accessing Defendant's website.

264.   Defendant owed to Plaintiffs and Class Members a duty to exercise reasonable care in handling and using Plaintiffs' and Class Members' communications and Disclosed Information in its care and custody, including implementing industry-standard privacy procedures sufficient to reasonably protect the information from disclosure and unauthorized transmittal and use of

communications and/or Disclosed Information that occurred.

265. Defendant acted with wanton and reckless disregard for the privacy and confidentiality of Plaintiffs' and Class Members' communications or Disclosed Information by disclosing and providing access to this information to Third Parties for the financial benefit of Third Parties (and fourth parties) and Defendant.

266. Defendant owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's disclosure of their communications or Disclosed Information to benefit Third Parties (and fourth parties) and Defendant. Defendant actively sought and obtained Plaintiffs' and Class Members' communications or Disclosed Information. And Defendant knew or should have known that by integrating tracking technology on its website that Plaintiffs' and Class Members' nonpublic personal information, including communications or Disclosed Information, would be disclosed to the Third Parties (and used by the fourth parties).

267. Plaintiffs' and Class Members' communications and Disclosed Information are highly valuable, and Defendant knew, or should have known, the harm that would be inflicted on Plaintiffs and Class Members by disclosing their communications or Disclosed Information to Third Parties. This disclosure was of benefit to the Third Parties (and fourth parties) and Defendant by way of data harvesting, advertising, and increased sales.

268. Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers in the handling and securing of communications and/or Disclosed Information of Plaintiffs and Class Members. This failure actually and proximately caused Plaintiffs' and Class Members' injuries.

269.   As a direct, proximate, and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or imminently will suffer injury and damages, including monetary damages, inappropriate advertisements and use of their communications or Disclosed Information for advertising purposes, and increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

270.   Defendant's negligence and breach of its common-law duties to exercise reasonable care directly and proximately caused Plaintiffs' and Class Members' actual, tangible, injury-in-fact and damages, including, without limitation: the unauthorized access of their communications or Disclosed Information by Third Parties (and fourth parties); improper disclosure of their communications or Disclosed Information; receipt of targeted advertisements reflecting private health information; lost benefit of their bargain; lost value of their communications or Disclosed Information and diminution in value; embarrassment, humiliation, frustration, and emotional distress; lost time and money incurred to mitigate and remediate the effects of use of their information, as to targeted advertisements that resulted from and were caused by Defendant's negligence; value to Plaintiffs and the Class Members of surrendering their choices to keep their communications or Disclosed Information private and allowing Defendant to track their data; increased risk of future harm resulting from future use and disclosure of Plaintiffs' and the Class Members' communications or Disclosed Information; and other injuries and damages as set forth herein. These injuries are ongoing, imminent, immediate, and continuing.

271.   Defendant's negligence directly and proximately caused the unauthorized access and disclosure of Plaintiffs' and Class Members' communications or Disclosed Information, and as a result, Plaintiffs and Class Members have suffered and will continue to suffer damages as a result of Defendant's conduct. Plaintiffs and Class Members seek actual and compensatory

damages, and all other relief they may be entitled to as a proximate result of Defendant's negligence.

272.    Plaintiffs and Class Members seek to recover the value of the unauthorized access to their communications or Disclosed Information resulting from Defendant's wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's personal information is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a Plaintiffs may generally recover the reasonable use value of the intellectual property—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such intellectual property to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiffs and Class Members have a protectible property interest in their communications and Disclosed Information; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions

273.    Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

**COUNT II**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiffs and the Classes)**

274.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

275.    Plaintiffs being this negligence *per se* count in the alternative to their common law negligence claim.

276.    Pursuant to the laws set forth herein, including the FTC Act, HIPAA, the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C and the other sections identified above, Defendant were required by law to maintain adequate and reasonable data and cybersecurity Disclosed to maintain the security and privacy of Plaintiffs' and Class Members' communications or Disclosed Information.

277.    Plaintiffs and Class Members are within the class of persons that these statutes and rules were designed to protect.

278.    Defendant had a duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiffs' and Class Members' communications or Disclosed Information.

279.    Defendant owed a duty to timely and adequately inform Plaintiffs and Class Members, in the event of their communications or Priv Disclosed ate Information being improperly disclosed to unauthorized Third Parties.

280.    It was not only reasonably foreseeable, but it was intended, that the failure to reasonably protect and secure Plaintiffs' and Class Members' communications or Disclosed Information in compliance with applicable laws would result in unauthorized Third Parties gaining

access to Plaintiffs' and Class Members' communications or Disclosed Information, and resulting in Defendant's liability under principles of negligence *per se*.

281.    Defendant violated its duty under Section 5 of the FTC Act, and/or state law by failing to use reasonable measures to protect Plaintiffs' and Class Members' communications or Disclosed Information and not complying with applicable industry standards as described in detail herein.

282.    Plaintiffs' and Class Member's communications or Disclosed Information constitutes personal property that was taken and misused as a proximate result of Defendant's negligence, resulting in harm, injury and damages to Plaintiffs and Class Members.

283.    As a proximate result of Defendant's negligence *per se* and breach of duties as set forth above, Plaintiffs and Class Members were caused to, *inter alia*, have their data shared with Third Parties without their authorization or consent, receive unwanted advertisements that reveal specific information related to seeking healthcare, fear, anxiety and worry about the status of their communications or Disclosed Information, diminution in the value of their personal data for which there is a tangible value, and/or a loss of control over their communications or Disclosed Information, all of which can constitute actionable actual damages.

284.    Defendant's conduct in violation of applicable laws directly and proximately caused the unauthorized access and disclosure of Plaintiffs' and Class Members' communications or Disclosed Information, and as a result, Plaintiffs and Class Members have suffered and will continue to suffer damages as a result of Defendant's conduct. Plaintiffs and Class Members seek actual, and compensatory damages, and all other relief they may be entitled to as a proximate result of Defendant's negligence *per se*.

285.    Plaintiffs and Class Members are also entitled to punitive damages resulting from

the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

**COUNT III**
**VIOLATION OF THE COMPREHENSIVE COMPUTER DATA ACCESS**
**AND FRAUD ACT, CAL. PENAL CODE § 502**
**(On Behalf of Plaintiffs and the California Subclass)**

286.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

287.    The California Legislature enacted the Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502 to "expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems," and finding and declaring "that the proliferation of computer technology has resulted in a concomitant proliferation of computer crime and other forms of unauthorized access to computers, computer systems, and computer data." Cal. Penal Code § 502(a).

288.    In enacting the CDAFA, the Legislature further found and declared "that protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental agencies, and others within this state that lawfully utilize those computers, computer systems, and data." Cal. Penal Code § 502(a).

289.    Plaintiffs' and the Class Members' devices on which they accessed Defendant's website, including their computers, smart phones, and tablets, constitute computers or "computer systems" within the meaning of CDAFA. Cal. Penal Code § 502(b)(5).

290.    By conduct complained of in the preceding paragraphs, Defendant violated Section 502(c)(1)(B) of CDAFA by knowingly accessing without permission Plaintiffs' and Class

69
CLASS ACTION COMPLAINT

Members' devices in order to wrongfully obtain and use their personal data, including their communications or Disclosed Information, in violation of Plaintiffs' and Class Members' reasonable expectations of privacy in their devices and data.

291.    Defendant violated Cal. Penal Code § 502(c)(2) by knowingly and without permission accessing, taking, copying, and using Plaintiffs' and the Class Members' communications or Disclosed Information.

292.    Defendant used Plaintiffs' and Class Members' data as part of a scheme to defraud them and wrongfully obtain their data and other economic benefits. Specifically, Defendant intentionally concealed from Plaintiffs and Class Members that Defendant had secretly installed tracking pixels on its website that surreptitiously shared communications and/or Disclosed Information with Third Party advertising companies like The Trade Desk and Google. Had Plaintiffs and Class Members been aware of this practice, they would not have used Defendant's website.

293.    The computers and mobile devices that Plaintiffs and Class Members used when accessing Defendant's website all have and operate "computer services" within the meaning of CDAFA. Defendant violated § 502(c) of the CDAFA by knowingly and without permission accessing and using those devices and computer services, and/or causing them to be accessed and used, *inter alia*, in connection with the Third Parties' (and fourth parties') wrongful use of such data.

294.    Under § 502(b)(12) of the CDAFA a "Computer contaminant" is defined as "any set of computer instructions that are designed to . . . record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information."

295.    Defendant violated § 502(c)(8) by knowingly and without permission introducing a computer contaminant via Trackers embedded into the website which intercepted Plaintiffs' and the Class Members' private and sensitive medical information.

296.    Defendant's violation of the CDAFA caused Plaintiffs and Class Members, at minimum, the following damages:

a.    Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b.    Defendant eroded the essential confidential nature of their relationship;

c.    Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value;

d.    Plaintiffs and Class Members did not get the full value of the healthcare services for which they paid, which included Defendant's duty to maintain confidentiality; and

e.    Defendant's actions diminished the value of Plaintiffs' and Class Members' communications or Disclosed Information.

297.    Plaintiffs and the Class Members seek compensatory damages in accordance with Cal. Penal Code § 502(e)(1), in an amount to be proved at trial, and injunctive or other equitable relief; as well as punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4) as Defendant's violations were willful and, upon information and belief, Defendant is guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294; and reasonable attorney's fees under § 502(e)(2).

298.    Plaintiffs and Class Members also seek such other relief as the Court may deem

equitable, legal, and proper.

**COUNT IV**
**VIOLATION OF CALIFORNIA'S CONSUMER PROTECTION LAW ("UCL"),**
**CAL. BUS. & PROF. CODE §§ 17200, *et seq.***
**(On Behalf of Plaintiffs and the California subclass)**

299.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

300.    Plaintiffs and Defendant are each a "person" under Cal. Bus. & Prof. Code § 17201.

301.    The California Business and Professions Code §§ 17201, *et seq*. prohibits acts of unfair competition, which includes unlawful business practices.

302.    Defendant's business acts and practices are "unlawful" under the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et. seq.* (the "UCL") because, as alleged above, Defendant violated California common law, and other statutes and causes of action alleged herein.

303.    Defendant engaged in unlawful acts and practices by imbedding the Pixel on its website, which tracks, records, and transmits Plaintiffs' and Class Members' communications or Disclosed Information they disclose to Defendant in confidence its website to Third Parties without Plaintiffs' and Class Members' knowledge and/or consent, in violation of the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*.; the Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502; and by representing that their services have characteristics, uses, or benefits that they do not have in violation of Civil Code § 1770.

304.    When using Defendant's website and services, Plaintiffs and Class Members relied on Defendant's status as a trusted healthcare institution.

305.    Inconsistent with its role as a healthcare provider, Defendant disclosed Plaintiffs' and Class Members' communications or Disclosed Information to Third Parties without their consent and for marketing purposes. Thus, Defendant represented that its services have characteristics, uses, or benefits that they do not have and represented that its services are of a

particular standard, quality, or grade when they were not, in violation of Cal. Civil Code § 1770.

306.    Plaintiffs and Class Members were reasonable to assume, and did assume, that Defendant would take appropriate measures to keep their communications or Disclosed Information secure and not share it with Third Parties or allow Third Parties (and fourth parties) to use it without their express consent. Defendant also had a duty to disclose that it was sharing their patients' communications or Disclosed Information with Third Parties. However, Defendant did not disclose at any time that it was sharing communications or Disclosed Information with Third Parties via tracking technologies or that Third Parties (and fourth parties) were using their communications or Disclosed Information.

307.    Had Plaintiffs and Class Members known that Defendant would intercept, collect, and transmit their communications or Disclosed Information to Third Parties, Plaintiffs and the Class Members would not have used Defendant's services.

308.    Plaintiffs and Class Members have a property interest in their communications or Disclosed Information. By surreptitiously collecting and otherwise misusing Plaintiffs' and Class Members' communications or Disclosed Information, Defendant has taken property from Plaintiffs and Class Members without providing just (or indeed any) compensation.

309.    By deceptively collecting, using, and sharing Plaintiffs' and Class Members' communications or Disclosed Information with Third Parties for Third Party (and fourth parties) use, Defendant has taken money or property from Plaintiffs and Class Members. Accordingly, Plaintiffs seek restitution on behalf of themselves and the Class.

310.    Defendant's business acts and practices also meet the unfairness prong of the UCL according to all three theories of unfairness.

311.    First, Defendant's business acts and practices are "unfair" under the UCL pursuant

to the three-part test articulated in *Camacho v. Automobile Club of Southern California* 142 Cal. App. 4th 1394, 1403: (a) Plaintiffs and Class Members suffered substantial injury due to Defendant's Disclosure of their communications or Disclosed Information; (b) Defendant's disclosure of Plaintiffs' and Class Members' communications or Disclosed Information provides no benefit to patients, let alone any countervailing benefit that could justify Defendant's Disclosure of communications or Disclosed Information without consent for marketing purposes or other pecuniary gain; and (c) Plaintiffs and Class Members could not have readily avoided this injury because they had no way of knowing that Defendant was implementing tracking technology.

312.    Second, Defendant's business acts and practices are "unfair" under the UCL because they are "immoral, unethical, oppressive, unscrupulous, or substantially injurious" to Plaintiffs and Class Members, and "the utility of [Defendant's] conduct," if any, does not "outweigh the gravity of the harm" to Plaintiffs and Class Members. *Drum v. San Fernando Valley Bar Ass'n,* (2010) 182 Cal. App. 4th 247, 257. Defendant secretly collected, disclosed, and otherwise misused Plaintiffs' and Class Members' communications or Disclosed Information by bartering it to Third Parties in return for marketing and profit. This surreptitious, willful, and undisclosed conduct is immoral, unethical, oppressive, unscrupulous, and substantially injurious. Moreover, no benefit inheres in this conduct, the gravity of which is significant.

313.    Third, Defendant's business acts and practices are "unfair" under the UCL because they run afoul of "specific constitutional, statutory, or regulatory provisions." *Drum*, 182 Cal. App. 4th at 256 (internal quotation marks and citations omitted). California has a strong public policy of protecting consumers' privacy interests, including consumers' personal data, as codified in California's Constitution in Article I, section 1; the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*.; and the CDAFA, Cal. Penal Code § 502, among other statutes.

314.    Defendant violated this public policy by, among other things, surreptitiously collecting, disclosing, and otherwise exploiting Plaintiffs' and Class Members' communications or Disclosed Information by sharing that information with Third Parties via tracking technologies without Plaintiffs' and/or Class Members' consent.

315.    Had Plaintiffs and Class Members known Defendant would intercept, collect, and transmit their communications or Disclosed Information to The Trade Desk and Google, and other Third Parties, Plaintiffs and Class Members would not have used Defendant's services.

316.    Plaintiffs and Class Members were reasonable to assume, and did assume, that Defendant would take appropriate measures to keep their communications or Disclosed Information secure and not share it with Third Parties without their express consent. Defendant was in sole possession of and had a duty to disclose the material information that Plaintiffs' and Class Members' communications or Disclosed Information would be shared with Third Parties via trackers. Defendant did not disclose at any time that they were sharing communications or Disclosed Information with Third Parties via trackers.

317.    Plaintiffs and Class Members have a property interest in their communications or Disclosed Information. By surreptitiously collecting and otherwise misusing Plaintiffs' and Class Members' communications or Disclosed Information, Defendant has taken property from Plaintiffs and Class Members without providing just (or indeed any) compensation.

318.    Plaintiffs and Class Members have lost money and property due to Defendant's conduct in violation of the UCL. Disclosed Information such as that which Defendant collected and transmitted to Third Parties has objective monetary value. Companies are willing to pay for such Disclosed Information, like the information Defendant unlawfully collected and transmitted to Third Parties. For example, Pfizer annually pays approximately $12 million to purchase

similarly sensitive information on health data, from various sources.[104]

319.    By deceptively collecting, using, and sharing Plaintiffs' and Class Members' communications or Disclosed Information with Third Parties, and by allowing Third Parties (and fourth parties) to use their communications or Disclosed Information, Defendant has taken money and/or property from Plaintiffs and Class Members. Accordingly, Plaintiffs seek restitution on behalf of themselves and the Class.

320.    As a direct and proximate result of Defendant's unfair and unlawful methods and practices of competition, Plaintiffs and Class Members suffered actual damages, including, but not limited to, the loss of the value of their Disclosed Information.

321.    As a direct and proximate result of its unfair and unlawful business practices, Defendant has each been unjustly enriched and should be required to make restitution to Plaintiffs and Class Members pursuant to §§ 17203 and 17204 of the California Business & Professions Code, disgorgement of all profits accruing to Defendant because of its unlawful and unfair business practices, declaratory relief, attorney fees and costs (pursuant to Cal. Code Civ. Proc. §1021.5), and injunctive or other equitable relief.

**COUNT V**
**VIOLATION OF CALIFORNIA CONSUMER PRIVACY ACT,**
**Cal. Civ. Code § 1798.100, *et seq.***
**(On Behalf of Plaintiffs and the California subclass)**

322.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

323.    The CCPA grants consumers rights, including the right to know what personal information is being collected about them and whether that information is sold or disclosed and to

---

[104]    Adam Tanner, *How Data Brokers Make Money Off Your Medical Records*, SciAm (Feb. 1, 2016), https://www.scientificamerican.com/article/how-data-brokers-make-money-off-your-medical-records/ (last visited Jul. 16, 2025).

whom, the right to prohibit the sale of their personal information, the right to request deletion of their personal information, and the right to nondiscrimination in service and price when they exercise privacy rights. Cal. Civ. Code § 1798.100, *et seq.*

324.    The CCPA dictates specifically that "[a] third party shall not sell <u>or share</u> personal information about a consumer that has been sold to<u>, or shared with,</u> the third party by a business unless the consumer has received explicit notice and is provided an opportunity to exercise the right to opt-out." Cal. Civ. Code § 1798.115 (emphasis added).

325.    CCPA states that "law relating to consumers' personal information should be construed to harmonize with the provisions of this title." Cal. Civ. Code § 1798.175. The CCPA further explicitly states that "in the event of a conflict between other laws and the provisions of this title, the provisions of the law that afford the greatest protection for the right of privacy for consumers shall control." *Id.* Thus, the 'opt-out requirements' under the CCPA apply in this online context.

326.    Defendant collected Plaintiffs' and Class Members communications and/or Disclosed Information, including their personal information, with the purpose of providing healthcare services in the course of and as part of its business in California.

327.    Plaintiffs allege that Defendant allowed Third Parties to embed trackers, such as The Trade Desk and Google, on its website and that these Trackers transmitted Plaintiffs' personal information.

328.    Disclosing Plaintiffs' and Class Members' communications or Disclosed Information to Third Parties was not reasonably necessary or proportionate to perform the reasonably expected healthcare services that they applied for or received.

329.    By collecting, using, and selling Plaintiffs' and Class Members' personal

information and location data to Third Parties for Third Party (and fourth party) use, all without providing consumers with notice, Defendant violated the CCPA.

330.    By failing to inform patients like Plaintiffs and Class Members of the personal information collected about them and the Third Parties with whom that personal information was shared, and the Third Parties' (and fourth parties') use of that personal information, Defendant violated the CCPA.

331.    By failing to abide by patients' requests to delete collected personal information, Defendant violated the CCPA.

332.    Pursuant to Cal. Civ. Code § 1798.150(b), Plaintiffs will send Defendant notice of their CCPA claims shortly after the date of this filing. If Defendant does not correct its business practices, Plaintiffs will amend (or seek leave to amend) the complaint to add claims for monetary relief, including statutory and actual damages under the CCPA. To date, Defendant has failed to cure the CCPA violation.

333.    As a result of Defendant's reckless violations, Plaintiffs are entitled to actual damages, statutory damages, and attorneys' fees and costs. Cal. Civ. Code § 1798.150.

## COUNT VI
## BREACH OF EXPRESS AND IMPLIED CONTRACT
### (On Behalf of Plaintiffs and the Classes)

334.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

335.    Plaintiffs and Class Members also entered into an express and implied contract with Defendant when they obtained healthcare from Defendant, or otherwise provided nonpublic personal information, including communications or Disclosed Information, to Defendant.

336.    As part of these transactions, Defendant explicitly and implicitly agreed to

safeguard and protect Plaintiffs' and Class Members' communications or Disclosed Information.

337.    Plaintiffs and Class Members entered into express and implied contracts with the reasonable expectation (based on Defendant's own express and implied promises) that Defendant would keep their nonpublic personal information, including Disclosed Information, confidential. Plaintiffs and Class Members believed that Defendant would use part of the monies paid to Defendant under the express and implied contracts to keep their nonpublic personal information, including Disclosed Information, confidential.

338.    Plaintiffs and Class Members would not have provided and entrusted their nonpublic personal information, including communications and/or Disclosed Information, or would have paid less for Defendant's services in the absence of the express and implied contract or implied terms between them and Defendant. The safeguarding of the nonpublic personal information, including communications and Disclosed Information, of Plaintiffs and class members was critical to realize the intent of the parties.

339.    As extensively detailed above, Defendant breached its express and implied contracts with Plaintiffs and class members to protect their nonpublic personal information, including communications and Disclosed Information, when it disclosed that information to Third Parties.

340.    As a direct and proximate result of Defendant's breach of express and implied contract, Plaintiffs and Class Members sustained actual losses and damages as described in detail above.

**COUNT VII**
**UNJUST ENRICHMENT (AS ALTERNATIVE TO CONTRACT CLAIMS)**
**(On Behalf of Plaintiffs and the Classes)**

341.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth

herein.

342.    Plaintiffs and Class Members have an interest, both equitable and legal and financial, in their communications and/or Disclosed Information, that was conferred upon, collected by, and maintained by Defendant and that was ultimately disclosed without their consent.

343.    Plaintiffs and Class Members conferred a monetary benefit upon Defendant in the form of valuable, sensitive, personal, and healthcare information—communications and/or Disclosed Information—that Defendant collected from Plaintiffs and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, for marketing purposes, and for sale or trade with Third Parties. Defendant did not share this benefit with Plaintiffs and Class Members.

344.    Plaintiffs and Class Members would not have used Defendant's services, or would have paid less for those services, if they had known that Defendant would collect, use, and disclose their communications or Disclosed Information to Third Parties or allow Third Parties (and fourth parties) to use their communications or Disclosed Information.

345.    Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiffs and Class Members.

346.    The benefits that Defendant derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members themselves. Under unjust enrichment principles, it would be inequitable for Defendant to retain the profit and/or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

347.    Defendant continues to benefit and profit from its retention and use of Plaintiffs' and Class Members' communications or Disclosed Information, while its value to Plaintiffs and Class Members has been diminished.

348.     Plaintiffs plead this claim separately as well as in the alternative to claims for damages under Fed. R. Civ. P. 8(a)(3), because if the Court dismisses Plaintiffs' claims for damages or enters judgment on them in favor of the Defendant, Plaintiffs' will have no adequate legal remedy. Plaintiffs make the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in her other causes of action, in the event that such causes of action do not succeed. Plaintiffs and the Class Members may be unable to obtain monetary, declaratory and/or injunctive relief directly under other causes of action, and, if so, will lack an adequate remedy at law.

349.     Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds it received as a result of the conduct and the unauthorized Disclosure alleged herein

**COUNT VIII**
**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiffs and the Class)**

350.     Plaintiffs reallege and incorporate the above allegations as if fully set forth herein.

351.     A relationship existed between Plaintiffs and the Class, on the one hand, and Defendant, on the other, in which Plaintiffs and the Class put their trust in Defendant to protect the communications or Disclosed Information of Plaintiffs and the Class, and Defendant accepted that trust.

352.     Defendant breached the fiduciary duty that it owed to Plaintiffs and the Class Members by failing to act with the utmost good faith, fairness, and honesty, failing to act with the highest and finest loyalty, and failing to protect, and intentionally disclosing, their communications or Disclosed Information.

353.     Defendant's breach of fiduciary duty was a legal cause of injury-in-fact and damage

to Plaintiffs and the Class, as alleged herein.

354.    But for Defendant's breach of fiduciary duty, the injury-in-fact and damage to Plaintiffs and the Class would not have occurred.

355.    Defendant's breach of fiduciary duty substantially contributed to Plaintiffs' and Class Members' damages.

356.    As a direct and proximate result of Defendant's breach of fiduciary duty, Plaintiffs and Class Members are entitled to and do demand actual, compensatory, nominal and punitive damages, injunctive relief, and all other relief allowed by law.

**COUNT IX**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiffs the Nationwide Class, and the California Subclass)**

357.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

358.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, the Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this complaint.

359.    An actual controversy has arisen regarding Defendant's present and prospective common law and other duties to keep its patients' communications and Disclosed Information confidential and whether Defendant is currently keeping that information confidential. Plaintiffs are Defendant's patients who need to use Defendant's website to manage their healthcare. Plaintiffs and similar Class Members thus remain at imminent risk that additional disclosure of their communications or Disclosed Information will occur in the future.

360.    Pursuant to its authority under the Declaratory Judgment Act, this Court should

enter a judgment declaring, among other things, the following:

      a.  Defendant continues to owe a legal duty to secure patients' communications or Disclosed Information, under the common law, HIPAA, Section 5 of the FTC Act, and various state statutes;

      b.  Defendant continues to breach this legal duty by disclosing its patients' communications or Disclosed Information to unaffiliated Third Parties.

361.    The Court also should issue corresponding prospective injunctive relief requiring Defendant to keep its nonpublic personal information, including communications and Disclosed Information, confidential consistent with law and industry standards.

362.    If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury, and lack an adequate legal remedy. The risk of additional disclosure is real, immediate, and substantial as the Trackers remain operative on Defendant's website to this day. If additional disclosure occurs, Plaintiffs and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

363.    The hardship to Plaintiffs and Class Members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, if Defendant continues to disclose its patients' communications or Disclosed Information, Plaintiffs and Class Members will likely be subjected to the harms described herein. On the other hand, the cost to Defendant of complying with an injunction by keeping its patients' communications or Disclosed Information, confidential is relatively minimal (for example, removing trackers from its website), and Defendant has a pre-existing legal obligation to do so.

364.    Issuance of the requested injunction will not disserve the public interest. To the

CLASS ACTION COMPLAINT

contrary, such an injunction would benefit the public by preventing Defendant's additional unlawful disclosures of patients' communications or Disclosed Information, thus eliminating the additional injuries that would result to Plaintiffs and the hundreds of thousands of patients whose information has been and will continue to be disclosed.

**COUNT X**
**BREACH OF CONFIDENCE**
**(On Behalf of Plaintiffs, the Nationwide Class, and the California Subclass)**

365.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

366.    At all times during Plaintiffs' and Class Members' interactions with Defendant, Defendant was fully aware of the confidential and sensitive nature of Plaintiffs' and Class Members' communications and/or Disclosed Information.

367.    As alleged herein and above, Defendant's relationship with Plaintiffs and Class Members was governed by terms and expectations that Plaintiffs' and Class Members' communications or Disclosed Information, would be collected, stored, and protected in confidence, and would not be disclosed to Third Parties, or used by Third Parties (and fourth parties) without notice and consent.

368.    Plaintiffs and Class Members provided Defendant with their communications or Disclosed Information, with the explicit and implicit understandings that Defendant would protect and not permit that information to be disseminated to and used by unaffiliated Third Parties (and fourth parties) without notice, consent, and sufficient opportunity to opt out.

369.    Defendant voluntarily received in confidence Plaintiffs' and Class Members' communications or Disclosed Information, with the understanding and affirmative representation to patients that the information would not be disclosed or disseminated to unaffiliated Third Parties for Third Parties' (and fourth parties') marketing purposes.

370.    Defendant disclosed Plaintiffs' and Class Members' communications or Disclosed Information, without notice, without express permission, and without opportunity to opt out.

371.    But for Defendant's Disclosure of Plaintiffs' and Class Members' Disclosed Information, in violation of the parties' understanding of confidence, their communications or Disclosed Information would not have been disclosed to Third Parties, or used for Third Party (and fourth party) marketing and profit, without their consent.

372.    The injury and harm Plaintiffs and Class Members suffered was the reasonably foreseeable result of Defendant's nonconsensual disclosure of Plaintiffs' and Class Members' communications or Disclosed Information. Defendant knew it was disclosing Plaintiffs' and Class Members' communications or Disclosed Information to Third Parties, for Third Party (and fourth party) use, without their consent.

373.    As a direct and proximate result of Defendant's breaches of confidence, Plaintiffs and Class Members have been injured and are entitled to damages in an amount to be proven at trial.

374.    Plaintiffs seek all monetary and non-monetary relief allowed by law.

**COUNT XI**
**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT,**
**CAL. PENAL CODE §§ 631**
**(On Behalf of Plaintiffs and the California subclass)**

375.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

376.    The California Legislature enacted the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 630, *et seq*. declaring that:

> advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

The Legislature by this chapter intends to protect the right of privacy of the people of this state.

Cal. Penal Code § 630.

377.    To establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

*Or*

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

*Or*

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

*Or*

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

378.    Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook,*

*Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' Internet browsing history); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

379.   Defendant's website and the tracking technologies Defendant intentionally installed on it are prohibited, as they constitute a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

380.   All alleged communications between individual Plaintiffs or Class Members and Defendant qualify as protected communications under CIPA because each communication is made using personal computing devices (e.g., computers, smartphones, tablets) that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

381.   CCPA and CIPA are complementary statutes. CCPA states that "law relating to consumers' personal information should be construed to harmonize with the provisions of this title." Cal. Civ. Code § 1798.175. CCPA further explicitly states that "in the event of a conflict between other laws and the provisions of this title, the provisions of the law that afford the greatest protection for the right of privacy for consumers shall control." *Id.* The 'opt-out requirements' under the CCPA apply in this online context.

382.   As alleged in the preceding paragraphs, by use of tracking technology, Defendant used a recording device to record the confidential communications in transit including communications or Disclosed Information without the consent of Plaintiffs or Class Members and then transmitted such information to Third Parties for Third Party (and fourth party) use.

383.   At all relevant times, Defendant's aiding of Third Parties to learn the contents of

communications and Defendant's recording of confidential communications was without Plaintiffs' and the Class Members' authorization and consent.

384.    Plaintiffs and Class Members had a reasonable expectation of privacy regarding the confidentiality of their communications with Defendant. Defendant had duties under statutory and common law to safeguard its patients' communications and/or Disclosed Information, and not disclose it without authorization. Defendant never received any authorization and disclosed Plaintiffs' and the Class's communications or Disclosed Information regardless.

385.    Defendant engaged in and continued to engage in interception by aiding others (including The Trade Desk and Google) to secretly record the contents of Plaintiffs' and Class Members' wire communications.

386.    The intercepting devices used in this case include, but are not limited to:

a.    Those to which Plaintiffs' and Class Members' communications were disclosed;

b.    Plaintiffs' and Class Members' personal computing devices;

c.    Plaintiffs' and Class Members' web browsers;

d.    Plaintiffs' and Class Members' browser-managed files;

e.    Trackers like The Trade Desk tracker;

f.    Trackers like the Google tracker;

g.    Trackers like the Microsoft tracker;

h.    Internet cookies;

i.    Other pixels, trackers, and/or tracking technology installed on Defendant's website and/or server;

j.    Defendant's computer servers;

k.    Third Party source code utilized by Defendant; and

l.    Third Party computer servers (including The Trade Desk and Google).

387.    Defendant aided in the interception of contents in that the data from the communications between Plaintiffs and/or Class Members and Defendant that were redirected to and recorded by the Third Parties include information which identifies the parties to each communication, their existence, and their contents.

388.    Plaintiffs and Class Members reasonably expected that their communications and Disclosed Information were not being intercepted, recorded, and disclosed to Third Parties or used by Third Parties (and fourth parties) for marketing and profit.

389.    No legitimate purpose was served by Defendant's willful and intentional disclosure of Plaintiffs' and Class Members' communications or Disclosed Information to Third Parties. Neither Plaintiffs nor Class Members consented to the disclosure of their communications or Disclosed Information by Defendant to Third Parties or the use of the communications or Disclosed Information by Third Parties (and fourth parties).

390.    The Trackers that Defendant used are designed such that they transmitted each of a website user's actions to Third Parties alongside and contemporaneously with the user initiating the communication. Thus, Plaintiffs' and Class Members' communications were intercepted in transit to the intended recipient (Defendant) before they reached Defendant's servers.

391.    Defendant willingly facilitated the Third Parties' interception and collection of Plaintiffs' and Class Members' communications or Disclosed Information, and the Third Parties' (and fourth parties') use of their communications or Disclosed Information, by embedding the Trackers on its website. Moreover, Defendant had full control over these Trackers, including which webpages contained the pixels, what information was tracked and shared, and how events were categorized prior to transmission.

392.    Defendant gave substantial assistance to Third Parties in violating the privacy rights of Defendant's patients, even though Defendant's conduct constituted a breach of the confidentiality duties that it owed, including the duty healthcare institutions owe to their patients and patients' property. Defendant knew that the installation of the Trackers on its website would result in the unauthorized disclosure of its patients' communications to Third Parties, and Third Party (and fourth party) use of those communications, yet nevertheless did so anyway.

393.    Plaintiffs' and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their communications or Disclosed Information, including using their communications or Disclosed Information to develop marketing and advertising strategies.

394.    The communications or Disclosed Information that Defendant assisted Third Parties with reading, learning, and exploiting, included Plaintiffs' and Class Members' communications or Disclosed Information patients input into and accessed on Defendant's website. Defendant disclosed details about patients, like Plaintiffs and Class communications or Disclosed Information and their interactions with Defendant's website, their status as medical patients; their searches for health conditions or concerns; and identifying information including IP addresses and identifying cookies.

395.    Plaintiffs and the Class Members seek statutory damages under Cal. Penal Code § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief.

396.    In addition to statutory damages, Defendant's violations caused Plaintiffs and Class Members the following damages.

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private.

b. Defendant eroded the essential confidential nature of the patient-doctor relationship.

c. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the healthcare services for which they paid, which included Defendant's duty to maintain confidentiality; and

e. Defendant's actions diminished the value of Plaintiffs' and Class Members' communications or Disclosed Information.

397. Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

## COUNT XII
## VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL CODE §§ 632
### (On Behalf of Plaintiffs and the California subclass)

398. Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

399. CIPA § 632(a) prohibits an entity from intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

400. As alleged in the preceding paragraphs, by use of tracking technology, Defendant

used a recording device to record the confidential communications including Disclosed Information without the consent of Plaintiffs or Class Members and then transmitted such information to Third Parties for Third Party (and fourth party) use.

401. At all relevant times, Defendant's aiding of Third Parties to learn the contents of communications and Defendant's recording of confidential communications was without Plaintiffs' and the Class Members' authorization and consent.

402. Plaintiffs and Class Members had a reasonable expectation of privacy regarding the confidentiality of their communications with Defendant. Defendant had duties under statutory and common law to safeguard its patients' communications and Disclosed Information, and not disclose it without authorization. Defendant never received any authorization and disclosed Plaintiffs' and the Class's communications and Disclosed Information regardless.

403. Defendant engaged in and continued to engage in interception by aiding others (including The Trade Desk and Google) to secretly record Plaintiffs' and Class Members' wire communications.

404. The intercepting devices used in this case include, but are not limited to:

a. Those to which Plaintiffs' and Class Members' communications were disclosed;

b. Plaintiffs' and Class Members' personal computing devices;

c. Plaintiffs' and Class Members' web browsers;

d. Plaintiffs' and Class Members' browser-managed files;

e. Trackers like The Trade Desk tracker;

f. Trackers like the Google tracker;

g. Trackers like the Microsoft tracker;

h. Internet cookies;

CLASS ACTION COMPLAINT

i.  Other pixels, trackers, and/or tracking technology installed on Defendant's website and/or server;

j.  Defendant's computer servers;

k.  Third Party source code utilized by Defendant; and

l.  Third Party computer servers (including The Trade Desk and Google).

405.  Defendant aided in the interception of contents in that the data from the communications between Plaintiffs and/or Class Members and Defendant that were redirected to and recorded by the Third Parties include information which identifies the parties to each communication, their existence, and their contents.

406.  Plaintiffs and Class Members reasonably expected that their communications or Disclosed Information were not being intercepted, recorded, and disclosed to Third Parties or used by Third Parties (and fourth parties) for marketing and profit.

407.  No legitimate purpose was served by Defendant's willful and intentional disclosure of Plaintiffs' and Class Members' communications or Disclosed Information to Third Parties. Neither Plaintiffs nor Class Members consented to the disclosure of their communications or Disclosed Information by Defendant to Third Parties or the use of the communications or Disclosed Information by Third Parties (and fourth parties).

408.  The Trackers that Defendant used are designed such that they transmitted each of a website user's actions to Third Parties alongside and contemporaneously with the user initiating the communication. Thus, Plaintiffs' and Class Members' communications were intercepted in transit to the intended recipient (Defendant) before they reached Defendant's servers.

409.  Defendant willingly facilitated the Third Parties' interception and collection of Plaintiffs' and Class Members' communications or Disclosed Information, and the Third Parties'

(and fourth parties') use of their communications or Disclosed Information, by embedding Trackers on its website. Moreover, Defendant had full control over these Trackers, including which webpages contained the pixels, what information was tracked and shared, and how events were categorized prior to transmission.

410.     Defendant gave substantial assistance to Third Parties in violating the privacy rights of Defendant's patients, even though Defendant's conduct constituted a breach of the confidentiality duties that it owed, including the duty healthcare institutions owe to their patients and patients' property. Defendant knew that the installation of the Trackers on its website would result in the unauthorized disclosure of its patients' communications to Third Parties, and Third Party (and fourth party) use of those communications, yet nevertheless did so anyway.

411.     Plaintiffs' and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their communications or Disclosed Information, including using their communications or Disclosed Information to develop marketing and advertising strategies.

412.     The communications or Disclosed Information that Defendant assisted Third Parties with reading, learning, and exploiting, included Plaintiffs' and Class Members' communications and Disclosed Information patients input into and accessed on Defendant's website. Defendant disclosed details about patients, like Plaintiffs and Class communications and Disclosed Information and their interactions with Defendant's website, their status as medical patients; their searches for health conditions or concerns; and identifying information including IP addresses and identifying cookies.

413.     Plaintiffs and the Class Members seek statutory damages under Cal. Penal Code § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount

of damages sustained by Plaintiffs and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief.

414.    In addition to statutory damages, Defendant's violations caused Plaintiffs and Class Members the following damages.

    a.    Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private.

    b.    Defendant eroded the essential confidential nature of the patient-doctor relationship.

    c.    Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value;

    d.    Plaintiffs and Class Members did not get the full value of the healthcare services for which they paid, which included Defendant's duty to maintain confidentiality; and

    e.    Defendant's actions diminished the value of Plaintiffs' and Class Members' communications or Disclosed Information.

415.    Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT XIII**
**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT,**
**CAL. PENAL CODE §§ 638.51, *et seq.***
**(On Behalf of Plaintiffs and the California subclass)**

416.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

417.    CIPA § 638.51 prohibits the installation or use of "a pen register or trap and trace device without first obtaining a court order." Cal. Penal Code § 638.51(a).

418.    Defendant repeatedly violated CIPA § 638.51(a) by installing and using the Trackers without a court order and without any valid consent from users. Defendant's continued use of Trackers after a user clicked "Decline all," as described in detail above, demonstrates that no valid consent was obtained. Instead, Defendant relied on a knowingly deceptive interface that falsely conveyed user control while continuing to intercept and transmit private communications.

419.    An "electronic communication" is defined as "any transfer of signs, signals, writings, images, sounds, data, or intelligence of any nature in whole or in part by a wire, radio, electromagnetic, photoelectric, or photo-optical system[.]" Cal. Penal Code § 629.51(a)(2).

420.    All communications between individual Plaintiffs or Class Members and Defendant qualify as protected communications under CIPA because each communication is made using personal computing devices (e.g., computers, smartphones, tablets) that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

421.    California Penal Code § 638.50(b) defines a "pen register" as "a device or process that records or decodes dialing, routing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

422.    The Trackers are "pen registers" under § 638.50(b) of CIPA because they record "routing, addressing, or signaling information" transmitted by the devices of visitors to Defendant's website. Cal. Penal Code § 638.50(b).

423.    California Penal Code § 638.50(c) defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the

source of a wire or electronic communication, but not the contents of a communication."

424.    The Trackers are also "trap and trace devices" under CIPA § 638.50(c) because they "capture the incoming electronic or other impulses that identify . . . dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication[.]" Cal. Penal Code § 638.50(c).

425.    During the Class Period, Defendant installed the Trackers on its website and used them to capture and transmit addressing information, including Plaintiffs' and Class Members' IP addresses and other unique identifiers to Third Parties.

426.    Plaintiffs and Class Members did not provide their consent prior to Defendant's installation and use of the Trackers. On information and belief, Defendant also did not obtain a court order to install or use the Trackers.

427.    Under California Penal Code § 637.2, Plaintiffs and Class members have been injured by Defendant's violations of California Penal Code § 638.51(a), and each seek statutory damages of $5,000 per violation.

428.    Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT XIV**
**VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")**
**18 U.S.C. §§ 2511(1), *et seq.***
**(On Behalf of Plaintiffs and the Classes)**

429.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

430.    The ECPA protects both sending and receipt of communications. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

431.    The transmissions of Plaintiffs' and Class Members' communications and/or

Disclosed Information to Defendant's website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

432. **Electronic Communications**. The transmission of communications or Disclosed Information between Plaintiffs and Class Members and Defendant's website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

433. **Content**. The ECPA defines content, when used with respect to electronic communications, to "include [] any information concerning the substance, purport, or meaning of that communication." *See* 18 U.S.C. § 2510(8).

434. **Interception**. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents…include any information concerning the substance, purport, or meaning of that communication." *See* 18 U.S.C. § 2510(4), (8).

435. **Electronic, Mechanical or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a.   Plaintiffs' and Class Members' browsers;

b.   Plaintiffs' and Class Members' computing devices;

c.   Defendant's web-servers;

d.   Defendant's website; and

e. The tracking technology deployed by Defendant effectuated the sending and acquisition of patient communications.

436.  By utilizing and embedding the tracking technology on its website, Defendant intentionally intercepted, endeavored to intercept and procured another person to intercept the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

437.  Specifically, Defendant intercepted Plaintiffs' and Class Members' electronic communications via the tracking technology which tracked, stored, and unlawfully disclosed Plaintiffs' and Class Members' communications or Disclosed Information to Third Parties.

438.  Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiffs and Class Members regarding Disclosed Information. Specifically, AHS shares information including but not limited to the text users type into a search bar with The Trade Desk and (historically) with Google. All of the named Plaintiffs recall using the search bar on the AHS website to search for treatment information, doctors, or support groups. AHS shared the text of the searches they entered with Third Parties. For example, Plaintiff Janet Doe uses AHS for obstetrics and gynecology. Any searches she entered related to that treatment were shared with Third Parties, without her knowledge and against her explicit instructions to AHS via its cookie banner.

439.  By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to Third Parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

440.  By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that

the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

441. **Unauthorized Purpose.** Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State – namely, invasion of privacy, among others.

442. Defendant intentionally used the wire or electronic communications to increase its profit margins and save on marketing costs.

443. Defendant specifically used tracking technology to track and to utilize Plaintiffs' and Class Members' communications or Disclosed Information for financial gain.

444. Defendant was not acting under color of law to intercept Plaintiffs' and Class Members' wire or electronic communication.

445. Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiffs' and Class Members' privacy via the tracking technology.

446. In sending and in acquiring the content of Plaintiffs' and Class Members' communications relating to the browsing of its website, Defendant's purpose was tortious, criminal and designed to violate federal and state legal provisions, including as described above the following: (i) a knowing intrusion into a private, place, conversation or matter that would be highly offensive to a reasonable person; and (ii) violation of HIPAA, the FTC Act, invading Plaintiffs' and Class Members' privacy, and in breach of its fiduciary duty of confidentiality.

**COUNT XV**
**VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**18 U.S.C. § 2511(3)(a)**
**UNAUTHORIZED DIVULGENCE BY ELECTRONIC COMMUNICATIONS SERVICE**
**(On Behalf of Plaintiffs, the Nationwide Class, and the California Subclass)**

447.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

448.    The ECPA statute provides that "a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication (other than one to such person or entity, or an agent thereof) while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient." 18 U.S.C. § 2511(3)(a).

449.    **Electronic Communication Service**. An "electronic communication service" is defined as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). Defendant's website is an electronic communication service which provides to users thereof, patients of Defendant, the ability to send or receive electronic communications; in the absence of Defendant's website, internet users could not send or receive communications regarding Plaintiffs' and Class Members' Disclosed Information.

450.    **Intentional Divulgence**. Defendant intentionally embedded the tracking technology and was or should have been aware that, if so configured, it could divulge Plaintiffs' and Class Members' communications or Disclosed Information. Upon information and belief, Defendant's divulgence of the contents of Plaintiffs' and Class Members' communications was contemporaneous with their exchange with Defendant's website, to which they directed their communications.

451.    Defendant divulged the contents of Plaintiffs' and Class Members' electronic

communications without authorization and/or consent.

452.    Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiffs and Class Members regarding communications or Disclosed Information. Specifically, AHS shares information including but not limited to the text users type into a search bar with at least The Trade Desk and (historically) with Google. All of the named Plaintiffs used the search bar on the AHS website to search for treatment information, doctors, and/or other support. AHS shared the content of their searches with The Trade Desk and Google via the Trackers AHS installed on its website.

453.    **Exceptions do not apply**. In addition to the exception for communications directly to an electronic communications service ("ECS")[105] or an agent of an ECS, the ECPA states that

> [a] person or entity providing electronic communication service to the public may divulge the contents of any such communication"…"as otherwise authorized in section 2511(2)(a) or 2517 of this title; "with the lawful consent of the originator or any addressee or intended recipient of such communication;" c. "to a person employed or authorized, or whose facilities are used, to forward such communication to its destination;" or d. "which were inadvertently obtained by the service provider and which appear to pertain to the commission of a crime, if such divulgence is made to a law enforcement agency.

U.S.C. § 2511(3)(b).

454.    Section 2511(2)(a)(i) provides:

> It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of a provider of wire or electronic communication service, whose facilities are used in the transmission of a wire or electronic communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the provider of that service, except that a provider of wire communication service to the public shall not utilize service observing or random monitoring except for mechanical or service quality control checks.

---

[105] An ECS is "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

455.    Defendant's divulgence of the contents of Plaintiffs' and Class Members' communications to Third Parties like Google and The Trade Desk were not authorized by 18 U.S.C. § 2511(2)(a)(i) in that it was neither: (i) a necessary incident to the rendition of Defendant's service nor (ii) necessary to the protection of the rights or property of Defendant.

456.    Section 2517 of the ECPA relates to investigations by government officials and has no relevance here.

457.    Defendant's divulgence of the contents of Plaintiffs' and the Class Members' communications on its website through the tracking technology was not done "with the lawful consent of the originator or any addresses or intended recipient of such communication[s]." As alleged above: (i) Plaintiffs and Class Members did not authorize Defendant to divulge the contents of their communications and (ii) Defendant did not procure the "lawful consent" from the website or apps with which Plaintiffs and Class Members were exchanging information.

458.    Moreover, Defendant divulged the contents of Plaintiffs' and Class Members' communications through tracking technology to individuals who are not "person[s] employed or whose facilities are used to forward such communication to its destination."

459.    The contents of Plaintiffs' and Class Members' communications did not appear to pertain to the commission of a crime and Defendant did not divulge the contents of their communications to a law enforcement agency.

460.    As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may assess statutory damages, preliminary and other equitable or declaratory relief as may be appropriate, punitive damages in an amount to be determined by a jury and a reasonable attorney's fee and other litigation costs reasonably incurred.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment as follows:

A.  For an Order certifying this action as a Class action and appointing Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

B.  For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

C.  For an award of punitive damages, as allowable by law;

D.  For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' communications or Disclosed Information and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

E.  For an Order declaring the rights and obligations of the parties, including, without limitation, that Defendant owes a legal duty to its patients to secure their communications or Disclosed Information and that Defendant violates this legal duty by disclosing its patients' communications or Disclosed Information to unaffiliated Third Parties;

F.  For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety and to disclose with specificity the type of communications or Disclosed Information compromised and unlawfully disclosed to Third Parties;

G.  For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

H.     For an Order compelling Defendant to pay for not less than three years of credit monitoring services for Plaintiffs and the Classes;

I.     For an award of reasonable attorneys' fees and costs under the laws outlined above, the common fund doctrine, and any other applicable law;

J.     Costs and any other expenses, including expert witness fees incurred by Plaintiffs in connection with this action;

K.     Pre- and post-judgment interest on any amounts awarded; and

L.     Such other and further relief as this court may deem just and proper.

### JURY DEMAND

Plaintiffs, individually and on behalf of all others similarly situated, hereby demand a trial by jury on all issues so triable.

Dated: August 8, 2025                    Respectfully submitted,

Natalie Lyons, No. 293026
Vess A. Miller, No. 278020
Lynn A. Toops*
COHENMALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
(317) 636-6481
nlyons@cohenmalad.com
vmiller@cohenmalad.com
ltoops@cohenmalad.com

J. Gerard Stranch, IV*
Emily E. Schiller*
STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
(615) 254-8801
(615) 255-5419 (facsimile)
gstranch@stranchlaw.com

eschiller@stranchlaw.com

Samuel J. Strauss*
Raina C. Borrelli*
STRAUSS BORRELLI, PLLC
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
(872) 263-1100
(872) 263-1109 (facsimile)
sam@straussborrelli.com
raina@straussborrelli.com

*To seek admission *pro hac vice*

***Counsel for Plaintiffs and the Proposed
Classes***

CLASS ACTION COMPLAINT